# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## NEWCOMB *et al.* v. BROOKS *et al.*

(Absent, MOORE, JUDGE.)

Decided December 20, 1879.

1879
Special Term.
———
Newcomb *et al.*
v.
Brooks *et al.*

1. A person, who occupies any fiduciary relation to another, is bound not to exercise for his own benefit and to the prejudice of the party, to whom he stands in such relation, any of the powers or rights, or any knowledge or advantage of any description, which he derives from such confidential relation.

2. A purchase by a fiduciary, while actually holding a fiduciary relation, of the trust-property, either of himself or of the party to whom he holds such fiduciary relation, is voidable at the option of the party to whom he stands in such a relation, although the fiduciary may have given an adequate price for the property and gained no advantage whatever.

3. But a fiduciary may purchase trust-property, if, when he purchases the property, he has been discharged from his character of fiduciary by the party to whom he had stood in such relation. But when he claims to have been so discharged by contract, he must satisfy the court, after it has made a most jealous and scrupulous examination, that such a contract was made, and that in obtaining his discharge from his character of fiduciary, that he might become a purchaser, there was no fraud, no concealment, and no advantage taken by him of any information acquired by him in his character of fiduciary.

4. *Quære*: Can an attorney-at-law in any case, even with the consent of his client, purchase property sold for the benefit of his client by a judicial sale pending the suits, or on an execution after judgment?

5. Without the consent of his client he cannot purchase for his own benefit any property of the defendant sold under execution, unless

he gives for it an amount equal to the ?whole of his client's judgment; and without such consent he can not purchase for his own benefit his client's property sold at a judicial sale.

6. A fiduciary cannot make a valid purchase of the trust-property, though it be made at a public judicial sale under a decree made in an adverse proceeding. Any such purchase may be avoided at his option by any party to whom he holds such fiduciary relation.

7. When there are several fiduciaries one can not purchase of the others, but such a purchase can be avoided at the option of the parties to whom such fiduciary relation is held; and the agent of such fiduciary or fiduciaries to sell the property is under a like disability to purchase. Any one of the persons, to whom such fiduciary relation is held, may avoid such a purchase so far as his interest is concerned, though all the others standing in the same relation to the fiduciaries are content that the sale shall stand.

8. If a fiduciary purchases trust-property and then re-sells it to a purchaser for valuable consideration with notice of the character of his title, the person, to whom the fiduciary occupied the fiduciary relation, may at his option avoid the sale, though the property has passed into the hands of a sub-purchaser with notice.

9. But if the sub-purchaser had no notice of the character of his vendor's title, the sale cannot be set aside, but the party can have redress against the fiduciary personally to the extent of the profit he made by the re-sale.

10. But when such sales are sought to be avoided, the suit for the purpose must be brought in a reasonable time, though the property remains in the hands of the fiduciary.

11. Where a tract of land was conveyed to a party to be held by him in trust for himself and numerous others, and he was appointed the agent of these equitable owners to manage the property and sell it at his pleasure, and one of the equitable owners brings a suit to have this property sold and to hold the trustee to an account for his agency, and the court renders a decree to sell the property with a view to a partition of the proceeds among the several owners, at a sale made by a commissioner under such decree the attorney for the trustee in the suit can not buy the property for his own benefit either with or without the consent of his client the trustee. And if he does purchase in the name of a third party, and the sale is confirmed by the court within two days after it is made, when the *cestuis que trust* were ignorant that the attorney of the trustee was the real purchaser, on an original bill brought by the *cestuis que trust* this decree of confirmation will be set aside, because the fact was not made known to the court, when the confirmation of the sale was asked, that the attorney for the trustee was the real purchaser, and the decree was therefore fraudulently

5

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

procured by the suppression of this fact. And in such case the fact that the trustee does not desire the decree of confirmation set aside will make no difference, as the *cestuis que trust* have a right to have it set aside without any inquiry as to the adequacy of the price.

Appeal from and *supersedeas* to a decree of the circuit court of Kanawha county, rendered on the 27th day of November, 1874, in a cause in said court then pending, wherein John M. Newcomb and others were plaintiffs and F. F. Brooks and others were defendants, allowed upon the petition of said plaintiffs.

Hon. J. Smith, judge of the seventh judicial circuit, rendered the decree appealed from.

GREEN, PRESIDENT, furnishes the following statement of the case:

In 1864 A. Buchanan and C. W. West, two of the defendants in this cause, bargained for a tract of land in Kanawha county on the Kanawha river, at the mouth of Rush creek, containing three thousand five hundred and sixty-six and two thirds acres. It was purchased for themselves and twenty-four others, each. of whom furnished $1,000.00. The understanding between the parties to this purchase is set forth in a written paper signed by them and dated Cincinnati, December 31, 1864, of which this is a copy: "Whereas, A. Buchanan and C. W. West have purchased (provided a perfect title can be made,) three thousand five hundred and sixty-six and two thirds acres of land bounding on the Kanawha river, about eight miles above Charleston, Virginia, for $26,000.00, for the undersigned, in the proportions set opposite our names respectively; it being understood that after the purchase is completed a majority in interest may decide as to forming a company or other mode to develope the oil properties of said land." This paper is signed by said Buchanan and by said West and by twenty-four others, and $1,000.00 is set opposite to the name of each signer. Each of these signatures is the

signature of a single individual except those which are as follows: F. J. Gettier, trustee, $1,000.00; N. Harris and W. Crane, $1,000.00; Wilshire & Co., $1,000.00; A. D. Bullock & Co., $1,000.00. On January 12, 1865, a deed for said land was made to said Alfred Buchanan and Charles W. West individually, the consideration named on the face of this deed is $24,000.00, though the sum of $26,000.00 is constantly spoken of as the price of this land, and that each of the parties who purchased it paid in cash his share of the purchase-money. The deed was taken in the name of Buchanan and West for convenience; and they held the legal title in trust for themselves and the other joint owners of the land, each of the signers to said agreement being entitled to one twenty-sixth part of said tract of land. At a meeting of these joint owners a few days afterwards, on January 23, 1865, they determined, if they could, to obtain thirty additional subscriptions of $1,000.00 each, and with this $30,000.00 to repay to the original owners the $20,000.00 they had paid in, and that thereafter each party who had paid in $1,000.00, including the twenty-six original subscribers, should be equal owners of this land. In other words, each party who had paid $1,000.00 was to own one fifty-sixth part of this land for each $1,000.00 he had paid in. This amounted to a sale by the twenty-six original owners of this land to the new owners of it, including themselves, at $56,000.00.

The arrangement was effected speedily; and a resolution was agreed to on February 21, 1865, at a meeting of the owners of these fifty-six shares, by which they authorized said Buchanan and West to spend the surplus funds, after paying back the $26,000.00 to the twenty-six original subscribers, in boring for oil on said land and in making preliminary surveys and plats. A paper was signed by nearly all the owners of this land authorizing this expenditure of their funds by Buchanan and West. The fund thus authorized to be spent was $4,000.00, the difference between the $30,000.00 paid in

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

by the owners of the new shares and the $26,000.00 paid back to the owners of the old shares.

In the meantime these parties obtained under the laws of Ohio a charter for a company, known as the "Donnally Trust Petroleum Company," for boring or digging for oil in the earth, for refining and purifying the same, the amount of the stock of the company to be $500,000.00, and the amount of each share to be $50.00, the principal office of the company to be in Cincinnati, and its operations to be on this tract of land in West Virginia. The owners of this land and none others, so far as the record discloses, took stock in this company. They took one thousand one hundred shares and paid in $5.00 on each share, amounting to $5,500.00 on March 6, 1865, and the company was organized by electing directors shortly thereafter. The $4,000.00 surplus paid in by the new subscriptions to the ownership of this tract of land, as well as the greater part of this $5,500.00 was spent by said Buchanan and West in purchasing an engine and machinery, in boring for oil under their direction, in taxes on the land, in attorney's fees, and in necessary expenses of the company.

The boring for oil turned out a failure; and at a meeting of the stockholders on January 1, 1866, they declined to elect directors for the next year, and the company was formally dissolved, this tract of three thousand five hundred and sixty-six and two-thirds acres never having been conveyed to it. Immediately thereafter the owners of this tract of land organized a meeting, in which forty out of the fifty-six shares were present in person or by agents, when they authorized the trustees, Buchanan and West, to sell, or to appoint agents to sell, this tract of land at not less than $15.00 per acre—which sale at that price would have amounted to $53,500.00, or $2,500.00 less than the price given for it by the shareholders of the fifty-six shares. The engines, tools, &c., of the oil company were sold for $850.00, and the money used by Buchanan and West.

Buchanan and West each made three trips from Cincinnati to Kanawha, to see about this land and the interest of the oil company, while it was in existence. And they both went to Kanawha county twice before the land was purchased, to see about its purchase. These trips occupied each from a week to ten days. They claim to have spent in paying their expenses and for the oil company and the owners of this land, including a compensation for their time, $12,124.16, or $1,774.16 more than they received, of which $3,000.00 is charged for expenses incurred in going to and from Kanawha, including the expenses of one or two members of the company who on one trip went with them, and for their services which they estimate at about half that amount. They do not now furnish any detail of these expenses; though they say they furnished them to the company.

Their charges, especially this item of $3,000.00, are controverted. The Chesapeake and Ohio railroad had a right of way condemned through this land. The damage was $600.00; and of this $450.00 was paid into court and $150.00 to counsel.

Buchanan and West, the trustees, not having sold this land after several years, one of the owners thereof, Frederick F. Brooks, one of the principal defendants in this cause, applied to them to convey to him two undivided fifty-sixth parts of this land, he being the owner of two of said shares. They refused to make such conveyance; and in April, 1871, he instituted a suit in the circuit court of Kanawha against them and the other then joint owners of this tract of land; and in his bill sets forth with some errors and inaccuracies the facts, and that the tract of land could not be divided, and prayed that his interest and the interest of all the owners in said land be established; that Buchanan and West be compelled to disclose the names and interest of all the owners of this tract of land, and how many interests and shares they have acquired from their *cestuis que trust*, and at what price, the amount of money that has come

into their hands, and how it has been spent; that the land be sold by the court and the proceeds divided among the true owners; and that in the meantime Buchanan and West be restrained from selling, mortgaging, conveying or incumbering this land, till all questions in controversy be settled; and for general relief. The injunction prayed for was awarded.

Buchanan and West filed their answer to this bill June 30, 1871, in which they set out the facts above stated more fully and accurately than was done in the bill, and they admit that the land cannot be divided among the several owners. They furnish a list of the original and former owners of this land. They state that said Buchanan owns now twelve shares or twelve fifty-sixths of this land, and West fourteen shares, or fourteen fifty-sixths of this land. They say that the additional shares or interests held by them were acquired by purchase from the several owners thereof, for a consideration satisfactory to said owners, and in which transactions the plaintiff has no interest or concern. They furnish a list of their receipts and expenditures, as hereinbefore stated, and claim that there is due them from the owners of this tract of land $1,774.16, which they claim as a lien on the land. They ask that this may be regarded as a cross-bill and the other owners of the land be summoned to answer the same. They unite in the prayer for the sale of the land, and ask that their said claim of $1,774.16 be paid out of the sale, and the balance be distributed among the owners of the lands according to their several rights.

There was a general replication to this answer.

The processes in the suit and in the cross-bill were not served on any of the defendants except by order of publication, they being non-residents. It was proved that the land was incapable of division without loss to all the owners; and therefore on November 15, 1871, the court rendered this decree in the cause and in the cross-bill:

"These causes came on to-day to be heard upon the

complainants' bill and exhibits, set for hearing as to all the defendants to said bill, they having been duly served with process by order of publication, legally published and posted, upon the joint answer of Buchanan and West, with general replication, upon said answer filed as a cross-bill and exhibits, set for hearing as to all the defendants to said cross-bill, they having been served with process by order of publication, legally published and posted, and upon depositions filed in the cause, and was argued by counsel. Upon consideration of all which, the Court is of the opinion, and doth decide, that the tract of land set out in complainants' bill situate on Kanawha river and Rush Creek, and purchased by Alfred Buchanan and C. W. West of the administrators with the will annexed of Andrew Donnally, deceased, was purchased by the said Buchanan and West in trust for themselves and others, and is now owned by the following named parties to this suit in the following proportions, to-wit:

"Alfred Buchanan, twelve fifty-sixths (12-56) parts thereof; C. W. West, fourteen fifty-sixths (14-56) parts thereof; David Gibson, F. F. Brooks, Thomas Goff, R. B. Smith, J. M. Newcomb, each two fifty-sixths (2-56) parts thereof; N. G. Nettleton, J. C. Butler, E. A. Ferguson, J. Schiff, Nat. Harris, J. M. Hanson, T. Neave, jr., A. P. C. Bonte, Wm. H. Woods, James Morrison, Wm. Craven, Conrad Schultz, J. N. Kinney, L. Devinny, P. W. Strader, Alfred Gaither, W. H. Bristol, E. G. Jones, J. C. Deitrich, each one fifty-sixth (1-56) shares part thereof; and the heirs of H. T. Handy jointly one fifty-sixth (1-56) part thereof. The Court is further of opinion, and doth decide from the evidence in the cause, that said tract of land is not susceptible of partition and allotment in kind among the several owners thereof, as above stated, without injury to the interest of said owners, but that a sale of said tract and a division of the proceeds would be more advantageous to the interest of said owners. It is therefore adjudged, ordered and decreed that Wm.

*Special Term 1879.*

*Newcomb et al.*
*v.*
*Brooks et al.*

A. Quarrier and Edward B. Knight, who are hereby appointed special commissioners for the purpose, do proceed to sell said tract of land by way of public auction to the highest bidder, at the front door of the court house of Kanawha county, after giving notice of the time, place and terms of sale by publication thereof for four successive weeks in some newspapers published in Kanawha county and by like publication for thirty days in some daily newspaper published in the city of Cincinnati, in the State of Ohio, for twenty per cent. of the purchase money in hand and the balance in three equal instalments at six, twelve and eighteen months respectively, taking bond with good security, bearing interest from day of sale, for the deferred instalments and retaining the title till the purchase-money is fully paid, but said commissioners may at their discretion take non-resident security on said bonds for the deferred instalments. And in making said sale said commissioners may sell said tract of land as a whole or in separate and convenient parcels, as will in their judgment, realize the largest price.

"But said commissioners are not to receive any money under this decree, until they shall enter into bond with good security in the clerk's office of this court in the penalty of $10,000.00, conditioned as required by law.

"And the court does not at this time pass upon the claim of the said Buchanan and West for a balance due for their services and expenses as trustees of said property, but reserves the same for further adjudication."

On the 11th of May, 1872, Nathaniel Harris and seven others of the defendants in said cause obtained from the judge of Kanawha county circuit court an injunction enjoining the commissioners, Quarrier and Knight, who had advertised said tract of land for sale, from selling the same till the further order of the court. They in their bill allege that they knew nothing of the pendency of this suit, until a friend placed in their hands the advertisement of the sale by these commissioners, and state that they wish to file a petition for a re-

hearing of the cause for the following reasons: That there was a combination between the plaintiff, Brooks, and the trustees, Buchanan and West, to begin this suit and buy in the land under its value without the knowledge of the other parties in interest, and they never communicated with the other parties, as was the duty of these trustees, all the parties living close together in and around Cincinnati, Ohio; that these trustees had failed to account for trust-funds and property in their hands; that their charge of $3,000.00 for their personal services was grossly unjust and unknown to the others; that they claim to have purchased of others twenty four shares or twenty four fifty-sixths of this land; that they bought these shares with trust-funds of parties at grossly inadequate prices, these parties being unable to hold them, and all the owners of these shares are entitled to participate in the purchase, unless the purchases are set aside, which they prefer; that the sale was to be made in eight days, and they are unable in so short a time to protect themselves against this combination.

Buchanan and West on June 25, 1872, filed an answer to this bill, they and said commissioners alone being made defendants to it. At the same time they gave notice of a motion to dissolve the injunction granted. Their answer denies the charge of combination between the mand the plaintiff, Brooks, alleged in the bill. They say that they intended to institute a suit for a sale of the property, but that they were anticipated in this suit by Brooks. They insist that the property ought to be sold, claim that their charges are all right, and the $3,000.00 but a small charge for their services and personal expenses, state that this tract of land was advertised in the Cincinnati *Gazette*, and that they mentioned the sale to such parties in interest as they met from time to time, and do and were doing all they could, and more than they were under legal obligation to do, to give notice of the sale and obtain a good price for the property. They deny that they have any trust-funds in their hands, but

6

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

on the contrary, they say, they have spent liberally of their own funds for the protection of the property, paying taxes, &c. They allege that if this charge were true, it would furnish no ground for stopping the sale, but only for revision of equities in disposing of the proceeds of the sale. They admit that they severally, not jointly, purchased of other owners at their request their shares, twenty four in number. They paid for them as much as they thought they were worth, and as the other parties were willing to take for them. They paid for them out of their own individual funds. They say that the parties who sold these shares are making no complaint, and others have nothing to do with the matter.

Fred. F. Brooks filed his answer January 21, 1872, in which he denies all combination between him and the trustees, Buchanan and West, to procure a decree of sale or to purchase the property or for any other purpose. The decree of sale was entered at the instance of Buchanan and West; and he did not know of it till some time afterwards. He expresses the opinion that a fair price could now be obtained for the property, and it should be sold, and concurs with the plaintiffs in the request that the accounts of the trustees should be rigorously scrutinized, and also all their dealings with the *cestuis que trust*.

No depositions were taken; and on July 12, 1872, the court dissolved this injunction; and the commissioners were directed to sell this tract of land after advertisement of the same in some newspaper published in Kanawha county, dispensing with the advertisement in a Cincinnati paper; and the settlement of the accounts of the trustees before a commissioner of the court was also ordered.

Pursuant to this decree the commissioners advertised this property in the *West Virginia Courier*, published in Kanawha county only, the costs being $15.00, while the cost of the former advertisement in the *Cincinnati Gazette* was $150.00. They offered the property for sale on October 26, 1872; and they report they got then a

bid of $17,000.00 only, and postponed the sale two days, when they got a bid of $21,500.00. They had this property cried the whole of that day; and then again adjourned the sale to the 29th of October, three days later. They then had the property cried some four hours; and getting no other bid they knocked the property down to F. F. Brooks at that price. At the previous offerings they received numerous bids. Brooks complied with the terms of sale. J. N. Smith was his security for the deferred payments. Two days after this sale, on October 31, 1872, there being no exceptions to this report, the sale was confirmed, the bill of Nathaniel Harris and others was dismissed at their costs, and they were required to pay the costs of advertising the sale they enjoined, amounting to $165.00; and the purchaser, Brooks, desiring a deed for the land, and no objection being made by any party, the former decree, which has been stated above and which required the title to be retained till the purchase-money was fully paid, was ordered to be so far modified as to allow a deed to be made to the purchaser, Brooks, then; and E. B. Knight was ordered to execute the deed, retaining the vendor's lien. About two weeks thereafter, on November 12, 1872, this deed was accordingly executed, and four days thereafter Brooks executed a deed to J. N. Smith for a moiety of this land. These deeds were promptly recorded. The deed from Brooks to J. N. Smith recites, that on May 14, 1872, they had entered into an agreement to purchase this land jointly at the sale then expected to take place on May 18, 1872, four days after said agreement was made; and that when the property was actually sold on October 29, 1872, this agreement was in force, as appears by an endorsement thereon.

At the next term of the court, on May 22, 1873, the eight persons who had enjoined the sale by the commissioners and ten others of the defendants filed a petition, praying that the deeds to Brooks and Smith and the sale made by the commissioners and the decree con-

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

firming the sale might be set aside and declared null and void as fraudulent. The court rejected this petition, on the ground that the relief sought could not be given in this suit, but could be asked only on an original bill. And thereupon the said petitioners filed an original bill on November 5, 1873, in said court for these purposes. The plaintiffs in this suit were the eighteen parties who had filed said petition, that is, Nathaniel Harris, Joseph C. Butler, William Craven, John M. Newcomb, P. W. Strader, Alfred Gaither, I. N. Kinney and Lafayette Divenny, of whom the first three were original shareholders and the other five new shareholders, these eight being the parties who had previously enjoined the sale by the commissioners, and also ten others, that is, Thomas Gaff, an old subscriber, James Morrison & Co., Wm. B. Wood, Conrad Schultz, Thomas Neave, jr. and A. P. C. Boute, new subscribers, and also Thomas J. Gethier, an old subscriber, and Wm. H. Kuler and M. C. Ford, new subscribers whose shares the trustees claimed to have purchased, and R. A. McFarland, heir of Wm. Y. McFarland a new subscriber whom West, trustee, claims to have bought out, these four last never having been made parties either as plaintiffs or defendants in any of the preceding suits.

The bill sets forth the facts hereinbefore stated, and gives a full history of the preceding suits; they insisting that the Donnally Tract Petroleum Company ought to have been a party to these suits and proceedings, and that the decrees ought to be set aside, because it was not made a party to it. It states that all the plaintiffs were non-residents, and never had any notice of these suits and proceedings or of the sale made under them, until the decree confirming said sale had been made ; that their property had been sold and sacrificed by the instrumentality of a joint owner, Brooks, and the trustees, Buchanan and West, who were not only trustees but also agents and managers of the property ; that these proceedings and sale were had without their knowledge, consent or

approbation, and were brought about by a fraudulent combination of said trustees and agents and said Brooks; that Brooks's whole object in bringing the suit was to buy in the land at a great sacrifice; and that Buchanan and West, the trustees, assented to the schemes of Brooks, because though the property was sacrificed they would still make a large speculation, they having before that time fraudulently and by false representations purchased of their *cestuis que trust* twenty-one fifty-sixths of this land for $2,100.00, which had cost these *cestuis que trust* $21,000.00, and which were worth, even at the grossly inadequate price at which the said Brooks bought the land, nearly $8,000.00 more than these trustees gave for them. The bill charges that the owners of this tract of land being all non-residents, Brooks and Buchanan and West, the trustees, combining fraudulently to have this sale made without the knowledge of the other owners have each of them thus succeeded in making a great speculation, the trustees realizing some $8,000.00 of profit besides the $3,000.00 that they improperly claim for their services and expenses, and Brooks buying at $21,500.00 property worth $175,000.00; that to effect these schemes so that they, when held to account, might deny them in their answer, and that the facts might be made incapable of proof, the counsel employed by Buchanan and West were closely connected in business and also by relationship with the plaintiff Brooks and with his counsel; that the counsel for Brooks were Messrs. Quarrier and Miller, and that the firm of Smith & Knight were counsel for Buchanan and West; that Isaac N. Smith was the brother-in-law of Brooks, the plaintiff in said suit, and that he entered into a contract with Brooks to purchase this tract of land at the sale by the commissioners jointly, though the sale was ostensibly made to Brooks alone, and about two months after the sale, and after they had received their deeds they published a pamphlet offering this land for sale or rent on royalty, and in it they set forth its great value on account of its

accessibility by railroad and by steamboats, and its great riches in minerals, coal, salt and iron, which pamphlet is filed with the bill; that the commissioners of sale well knew the great value of this land, but in their advertisement they set out none of the advantages, nor were they made known to the plaintiffs.

The bill alleges that Smith & Knight, the counsel of Buchanan and West, the trustees, had in their charge the interest of the plaintiffs, who were *cestuis que trust,* and that "they can not see how an attorney of the parties in interest, Isaac N. Smith, whose duty it was to advise and counsel them as to the proper proceedings to procure a re-sale, when their property is sold for less than its value, can be allowed to make an agreement whereby it became his interest not to advise them as to their rights, and he became interested in getting the land sold at the smallest possible price, or how he can be allowed to carry out such an agreement and become thereby a gainer at their cost." And so far from giving information of the sacrifice of the land the decree of confirmation was made in a hurry, in a few days after the sale and before the purchase-money was paid, and a deed ordered to be made at once "which they charge was done with the fraudulent purpose of cutting the plaintiffs off from relief, if possible." They also say that Knight was incompetent to act as commissioner, because he was counsel for Buchanan and West. The bill prays that their purchase of shares or interest in said land of their *cestuis que trust,* as well as the sale made by the commissioners to Brooks, be declared fraudulent and void; that the decree confirming said sale be set aside as fraudulent, as well as the deeds made to Brooks and Smith; and that Buchannan and West be required to settle their account as trustees; and for general relief.

The parties made defendants by this bill were Brooks and Smith, Quarrier and Knight, the commissioners, the Donnally Petroleum Company, the heirs and widow of H. F. Handy, one of the original shareholders in said

1879
Special Term

Newcomb *et al*
v.
Brooks *et al.*

land, David Gibson and N. B. Smith, original shareholders, and N. G. Nettleton, E. N. Ferguson, John Schiff, I. M. Hanson, W. H. Bristol, E. G. Jones and J. C. Detrich, new shareholders in said land. But the shareholders in this land, who in the former proceeding Buchanan and West stated they had purchased out, were none of them made defendants, though, as we have seen, four of them or their representatives were plaintiffs in this bill.

The eight of them who formerly filed a bill to obtain an injunction to the sale of the land by the commissioners, so far as the record shows, had no counsel in the court. The only thing done by them was the filing of this bill. It was signed by one of them for himself and others.

To the bill in the cause before us the defendants, Brooks, Smith, Buchanan and West and commissioners Quarrier and Knight filed answers. They deny that there was any agreement or conspiracies between Brooks and the trustees, Buchanan and West, in regard to said suit, either about its institution, its conduct or final determination, or about the sale of the property, the confirmation of the sale or any other thing. They say these charges were made substantially by substantially the same parties in the injunction-bill, and have been judicially acted upon. They deny that it was necessary or proper to make the Donnally Tract Petroleum Company a defendant to these suits, that company having been formally dissolved long since and never having had any title or interest in the land. They deny that the plaintiffs were ignorant of the existence of this suit or of the decree of sale or of the sale or its confirmation; and they refer to the fact that eight of the plaintiffs filed the bill of injunction in the former suit, and that the land was at first advertised in a Cincinnati paper, where most of the parties lived? They deny that the land was sold at a grossly inadequate price, and say the price paid was at that time its fair and just value, though Smith admits he regards it now as considerably more valuable, and that his statements about it in his pamphlet are correct.

They insist that the adequacy or inadequacy of the price paid for this land cannot now be enquired into, as it was finally settled by the decree of confirmation; and they rely on §8, chap. 132 of the Code of West Virginia to defeat any relief claimed in the bill. They say that the fact, that the agreement made between Brooks and Smith to purchase this land was voluntarily put on record, does not consist with the gross charges of fraud made in the bill in connection with this agreement. They deny that Smith and Knight were ever counsel for the plaintiffs. They say this firm consisted of Knight and Benjamin F. Smith, who acted as counsel for Buchanan, and that till the spring of 1871, when Benjamin F. Smith withdrew from the firm and Isaac N. Smith took his place, and the new firm of Smith & Knight thereafter acted as the counsel of Buchanan and West, but never as counsel for the plaintiffs, whose interest in said suits were, as they insisted, antagonistic to that of the plaintiffs in this cause. Smith says, "he sees no impropriety in counsel bidding at a judicial sale, and thus advancing the price of that which his client is interested should bring the highest possible price."

Buchanan and West admit their purchase severally of a number of the shares or interests in this land, but say they gave for them what they deemed a fair price, and what those they bought from were willing to take, and as they do not complain, it concerns no other persons. They claim that their account against the trust-fund and land is just and reasonable. The commissioners say they used their best endeavors to get the best price for the land they could, and made several adjournments for that purpose, one of which was made expressly to allow bidders to see the land, and after a personal examination of the land, they declined to bid higher for it than Brooks had bid. They say that there was no unusual or improper haste in the confirmation of the sale. It was done in the usual manner, the sale being made while the court was in session, and there being no exceptions to

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

their report. They deny all fraudulent collusion on their part in any particular, or with any person whatsoever. They say the sale was made in strict conformity with the decree, and the terms of the sale were fully complied with by the purchaser, and the commissioner had no special knowledge of the value of the land. Knight did not regard it as his duty to communicate with the plaintiffs with reference to the value of the land; and if he had desired to do so, he could not have done it, as he did not know their residence; and had he done so, it would only have been to inform them that the land had been sold for what he deemed a fair price. They say that it has been long the established practice of the courts to appoint the counsel of the parties, who are interested in the sale of the lands, the commissioners of sale, and to hold a sale void because such counsel has acted as commissioners of sale, would be to establish a principle, which would render voidable nine tenths of the judicial sales in this State. The process in this suit was not served on any of the other defendants, they being all proceeded against as non-residents by order of publication. General replications were filed to all the answers.

Many depositions were taken. They establish the facts already stated. They show that the accounts of the trustees are questions of controversy as yet unsettled.

C. W. West in his deposition stated that at specified dates between March 26, 1866, and September 11, 1870, he bought twelve shares, or fifty-sixths, of this tract of land severally of the plaintiff, Thomas J. Gettier, of the representative of W. Y. McFarland, one of the plaintiffs, and of one of the plaintiffs, H. C. Lord, and of Anna Philips, H. B. Cramer, I. L. Thomas, Thomas J. Weaver, Julius Brace, Thomas Swift, J. H. Wickman and W. Hover, who are not parties to this suit or any of the previous suits.

Alfred Buchanan deposes that he bought ten shares, or fifty-sixths, of this tract of land at specified dates be-

tween March 17, 1867, and December 30, 1869, severally of the plaintiffs, Wm. H. Keeler, and of George Pendleton, Wm. Fletcher, L. S. Williams, C. B. Williams, T. P. Saunders, George M. High and Wm. Wilshire & Co., who are not parties to this suit or any of the previous suits.

They give none of the circumstances under which these purchases were made, but simply say they paid for Gettier's share $110.00 and $100.00 for each of the other shares.

The plaintiff, R. A. McFarland, states that he is the heir of W. Y. McFarland, one of the stockholders, and he understands that West claims to have got this share from one of his personal representatives, and that he offered five or six times to purchase it of him for $100.00.

Butler Williams states that he enquired several times of A. Buchanan what the trustees were doing, and could get no satisfactory answer; and he then sold his share to him for $100.00. He and West both told him that they did not know that it was worth anything, as there was some trouble about the title of the land, and they did not know but that the property would be lost altogether.

There is no other evidence showing the circumstances attending any of the other purchases; but it is proven that the trustees, or one of them, told one of the shareholders that the property had gone up, that it had been sold for taxes, and their interest lost; that while they, or one of them, said the shares were not worth more than $100.00 each when they purchased, yet that Buchanan said he would not take less than at the rate of $20,000.00 for the whole tract for his interest, and that West bought one share through Gettier without it being disclosed to the seller that it was being bought for one of the trustees. It was proven that most of the shareholders live in Cincinnati, but one resides in New York, one in Chicago, one at Yellow Springs, Ohio, and one at Aurora, Indiana. The eight shareholders who obtained the injunction to the sale, were aware of the pendency of the

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

former suit, and also the plaintiffs, James Morrison and R. A. McFarland, as these parties sent Nathaniel Harris to Kanawha county, West Virginia, to stop the sale by the commissioners, and he reported that he had retained counsel and obtained the injunction. But these parties had no notice of the dissolution of the injunction, or of the subsequent advertisement of the property for sale and the sale thereof till after its confirmation except perhaps Harris and Gettier, and probably Thomas Gaff had notice of the second advertisement of the land, as the trustee, Buchanan, testifies he thinks he sent him by mail a copy of the advertisement. The record does not show whether many of the shareholders had or had not any knowledge of the pendency of the former suits. They were not notified thereof by the trustees; and it is proven that the plaintiffs, Conrad Schultz, A. P. C. Boute and Thomas Neave, had no knowledge of the pendency of these suits till after the confirmation of the sale, while the defendant, John Schiff, and probably J. M. Hanson, knew of the pendency of the suit, neither of them knew of the sale till after its confirmation.

There is no evidence of any arrangement or combination between F. F. Brooks and the trustees before the sale to buy this tract of land at the sale, or of any concert of action between them in the institution of the suits. His (Brooks's,) deposition was not taken; and Buchanan and West in their depositions say nothing on the subject. Nathaniel Harris says in his deposition that he suspected that such a combination had been made, because when he went to Charleston, Kanawha, to prevent the sale by the commissioners when it was advertised, they would not consent to postpone the sale, and objected to his telegraphing to Brooks asking his consent to the postponement, they saying they knew he wanted the sale to be made. One of these commissioners was counsel for Brooks and one for Buchanan and West, and this was doubtless the ground on which Harris in his bill of injunction based his charge of such

combination. F. F. Brooks was invited to attend the meeting of the eight shareholders who sent Harris to Charleston to stop this sale: but he did not attend, being then confined to his house by sickness.

The agreement between F. F. Brooks and his brother-in-law, Isaac N. Smith, one of the counsel of Buchanan and West, bears date about one week after this meeting, and three days after Harris obtained the injunction. It was entered into therefore after the counsel of Buchanan and West knew that some of the shareholders urged the postponement of the sale, because they apprehended that the property, if sold then, would be sacrificed. While there is no proof of any agreement between the trustees and Brooks to buy this land together, there is distinct proof that just about the time that Brooks entered into a written agreement with his brother-in-law, Smith, one of the counsel of Buchanan and West, to buy this land jointly, Buchanan and West at the office in Cincinnati of their counsel, E. A. Ferguson, one of the defendants in this cause, proposed to John Schiff, another defendant, that he should go up to Charleston, West Virginia, to attend this sale expected to be made then in about a week, and take with him the necessary funds, and in case it sold low, to buy it for these trustees and Schiff. This arrangement was advised by Ferguson, and that the purchase should be in the name of Schiff, because the trustees could not properly become purchasers. This is testified to distinctly by Schiff; and it is not contradicted by any of the other parties to the proposed arrangement, though the depositions of all of them were taken. This arrangement was not carried out. Schiff took time to consider it; and in a few days declined to go, as he could not leave in time to get there before the sale, and suggested that they should send some one else. But Harris in the meantime enjoined the sale; and it was not made for six months. When it was made, Buchanan and West were not present; and there is no evidence that they had any one there to bid for them, or that they

had any arrangement with Brooks to participate in the purchase. The depositions of neither Brooks nor Smith were taken; and neither Buchanan nor West in their depositions say anything on this subject.

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

The evidence with reference to the value of this tract of land at the time of the sale, is conflicting; but if we are to form a judgment from the evidence on this subject in the record, we could safely conclude that this tract of land was at that time worth at least twice as much as the price at which it sold, and that it has since enhanced in value.

The cause was heard on November 27, 1874, and the court being of opinion for reasons stated in writing that the plaintiffs were not entitled to the relief asked, the court dismissed the bill and rendered a decree against them in favor of the defendants for their costs. The following is the opinion of the court referred to in the decree :

"In this cause the plaintiffs' bill is predicated upon the following theory, that an original suit may be maintained to set aside a decree confirming a sale upon the same grounds and for the same causes, which would constitute valid objection to the confirmation of the sale. Unless I am very much mistaken, this position cannot be maintained ; it is the wise policy of the courts in administering the law to end litigation, and hence the presumption that all matter decided by a court of competent jurisdiction is decided correctly. Courts always hold their judgments and decrees to be an estoppel, and will only permit them to be attacked for fraud, which vitiates all proceedings, whether at law or in equity; and as far as I can recollect, it has never been held that relief can properly be granted to a party because of his laches and negligence, therefore it cannot be law that a party can stand by and suffer a sale made under a decree in chancery to be confirmed without objections, and afterwards, at a subsequent term, file an original bill, to attack and set aside

the decree confirming the said sale, unless there be fraud in procuring the decree.

" To hold the opposite doctrine by the courts, would go very far in destroying public confidence in judicial sales, which it is the policy of the law to uphold and sustain, unless there is fraud ; it would also be holding out inducements to negligence, which is not regarded as proper in the courts, either of common law or equity ; a person *compos mentis* and free from disability, is never relieved because of his own carelessness, inattention or negligence ; these are not regarded as good grounds of complaint in either form ; the decisions of tribunals competent must be taken as an estoppel, and regarded and held as conclusive of all matters therein decided, and are so treated in all future litigation between the same parties.    It ascertains and determines the rights and liabilities of parties, and settles the matter of dispute finally for them in the controversy ; and unless fraud is shown in the procurement of its judgments or decrees, will not suffer them to be interfered with.

"As I understand them, the important facts in this cause are about as follows:

"The plaintiffs and some of the defendants formed a co-partnership, and by purchase became the owners of a valuable property, the legal title to which was vested in Buchanan and West, trustees, for the convenience of the company, which for like convenience divided into shares and certificates of stock issued representing the amount of interest in each holder.    While in this condition Brooks became the owner of some of the shares or certificates of stock, and claimed to have an equitable interest in the property to the extent of the amount of the stock represented by the certificates he held.    The interest of Brooks the trustees declined to recognize, and on their refusal Brooks filed his bill in this court to have his rights ascertained, and determine his acquisition of the certificates of stock, and charging in his bill also misconduct and mismanagement by the trustees in refer-

ence to the property, and demanded a settlement of their accounts. To this bill the trustees answered, amongst other things, that the business had been very unprofitable, that in fact it had proved a failure, and that on account of advances which were by them made, and which were necessary to preserve the property from loss, waste, destruction and forfeitures, the company were largely indebted to them. The trustees also tendered their resignation. Their answer was also filed as a cross-bill, charging that the property was not susceptible of division without very materially affecting its value, and asking that the same might be sold and proceeds divided amongst those entitled to share therein. The accounts were settled and ascertained, the various interests fixed, and a decree entered by the court directing the sale of the property by commissioners, who were then appointed, being two of the counsel in the cause, one representing the interest on each side. At this stage of the case some seven or eight of the parties, plaintiffs in this suit, applied for and obtained an injunction to the sale, which appears in due course of time to have been dissolved by the court, and the sale then was made in pursuance of the former decree. The sale was duly reported by the commissioners to the court, and not being excepted to, was approved and confirmed by the court without objections, and so remained during the term. The next term of the court, however, (I think it was) the plaintiff made an informal effort by petition to set the sale and confirmation decree aside and to order a new sale, which petition the court refused to sustain, because it presented no case which the court could relieve by petition.

"The plaintiffs then brought this suit as an original suit, and have filed their bill seeking to impeach and set aside the sale and confirmation decree for fraud, and claim that the property sold for a price greatly under its value, and that inadequacy of price is of itself such a species of fraud as entitles the plaintiff to relief in a suit brought as this one is, to impeach a decree for fraud, and

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

as a further ground, they aver that I. N. Smith, who they claim to have been their counsel in the cause, acted in the purchase of said property as the ostensible agent of Brooks, but who was in truth and in fact, a partner with Brooks in the purchase. The charge of inadequacy under its proofs is not enough to show fraud in procuring the decree. But suppose it could, the plaintiffs had full legal notice of all the matters pertaining to it, before the confirmation decree was rendered, and failing to make their objection then, at the time of confirmation, their own negligence affords no grounds of relief in an original suit, which can only be maintained on the ground of fraud in procuring the decree complained of, and not upon the ground of fraud in the original cause of action, or for any other fraud, except in the procuring of the decree; this does not mean fraud in the sale, but simply that deception or fraud has been practiced in procuring the decree of confirmation. This doctrine applies with equal force to the charge that Smith was a joint purchaser with Brooks, but this point is still made stronger against the plaintiffs, because in reality the relation of counsel and client does not exist except in the imagination of the plaintiffs. The facts proved do not warrant the conclusion that Smith ever was either agent or attorney for the plaintiffs, or either of them in this case. If the facts proved warrant us in believing that Smith ever acted as counsel in this cause, it was counsel for the trustees in a suit between them and their *cestuis que trust*, in which their interests were opposed and antagonistic to each other in position and interest, Smith representing Buchanan and West in their legal controversy with the others, the present plaintiffs cannot be permitted to claim that he was counsel of the plaintiffs in that suit; he was the counsel for the trustees opposing the claim against the trustees, then how could he be regarded as counsel by construction in opposition to the plain facts of this case? It may be and is true that in a suit between the trustees and some outsiders who are endeavoring to as-

sert or set up a claim against and antagonistic to the interest or rights of the trust-property in the trustees, the counsel of the trustees is regarded as the counsel of the *cestuis que trust*; but this grows out of the fact that the legal rights of the *cestuis que trust* are vested in the trustee, and the trustee is alone regarded in courts of law; he is in such a case regarded as counsel of both, because their interests are one and the same; but certainly it would be straining the principle too far to so regard him in cases of litigation between themselves. There is no complaint by Buchanan and West of the conduct of Mr. Smith, and they only have the right to complain in this matter; the plaintiffs have no right to complain, because it is clear that the relation of counsel and client never existed between them. If the fact of an attorney being appointed and acting under the provisions of a decree, be good grounds to impeach and set a decree aside, almost all the sales made by the decrees of the courts of Virginia and West Virginia time out of mind are liable to be disturbed, and the courts would hesitate long before they would break down a custom which has been acquiesced in for a century; they are particularly qualified for performing their duties, being acquainted with the case, the law, the forms, and the duties required by the position, and their constant attendance upon court, they are always ready to correct mistakes, supply omissions and explain ambiguities. The courts would scarcely be justified or act wisely, to introduce confusion into the titles of the country by unnecessarily changing the time-honored and almost universal custom thereof. I, however, understood one of the plaintiffs' counsel as not relying on this point.

"I have been totally unable to perceive the fraud in the procurement of the decree complained of in this suit, and fraud in procuring the decree in the original suit being the only ground of jurisdiction in a suit to impeach a decree, it follows that I can give no relief in

this suit. The plaintiffs' bill will therefore be dismissed with costs, including an attorney's fee of $30.00."

From this decree an appeal has been taken to this Court.

*J. S. & T. B. Swann,* for appellants, relied upon the following authorities :

4 Johns. Chy. 119 ; 4 Cow. 718, 731, 733 ; 5 Johns. Chy. 49; 2 Rob. 302 ; 1 Story Eq. Juris. §§ 310, 311 and notes ; 2 Ves. Jr. 201 ; 11 Paige 538 ; 5 Watts & S. 348 ; 24 Pick. 89, 96 ; 1 Story Eq. Juris. § 246 ; 9 Paige 263 ; 3 Wils. Chy. 290 ; 4 W. Va. 600 ; 1 Ves. 215 ; 9 Dana 190 ; 3 P. Wms. 210 ; 9 Bush 660 ; Hill on Trustees 535 ; 12 Ves. 372 ; 2 Ves. 203 ; 1 Bush 330 ; 10 W. Va. 142 ; 2 B. Mon. 425 ; 2 Staunton's Ky. Dig. 1217 ; 1 Staunton's Ky. Dig. 328, 589, 560.

*E. B. Knight,* for appellees, Buchanan and West.

GREEN, PRESIDENT, delivered the opinion of the Court :

The questions presented by this record involve the consideration of the equitable doctrine, that a person who occupies any fiduciary relation to another, is bound not to exercise for his own benefit and to the prejudice of the party, to whom he stands in such relation, any of the powers or rights, or any knowledge or advantage of any description which he derives from such confidential position. This general principle is universally recognized by all courts. See *Whelpole* v. *Cookson,* 1 Ves. Sr. 9; *Fox* v. *Mackreth et al.,* 2 Bro. C. C. 400 ; 2 Cox 320 ; 4 Bro. P. C. 258 ; *Saunderson* v. *Walker,* 13 Ves. 601 ; *Butler* v. *Haskell,* 4 Dessau. (S. C.) 651 ; *Beeson* v. *Beeson,* 9 Barr (Pa. St.) 280 ; *Forbes* v. *Hasley* 33 Barb. 578 ; *The Cumberland Coal Co.* v. *Sherman,* 30 Barb. 553 ; *The Hoffman Coal Co.* v. *The Cumberland Coal Co. and Sherman,* 30 Barb. 159; *Carter &c.* v. *Harris,* 4

Rand. 204; *Buchler* v. *Lafferty's legatees*, 2 Rob. (Va.) 292; *Segar* v. *Edwards, &c.*, 11 Leigh 213.

This general principle of a court of equity, has been applied to a great variety of cases; but we will consider only those applications of it which bear most directly on the case before us for our consideration. It has often been held by courts and judges entitled to the highest respect and consideration, that a purchase by a trustee, or party holding any fiduciary relation, of the the trust-property or subject, although he may have given an adequate price therefor and gained no advantage whatever, is voidable at the pleasure of the *cestui que trust*, or party to whom such confidential relation is borne by the purchaser, and that if at the time of the purchase the vendee occupied such confidential relation, this sale can be set aside by the *cestui que trust*, or party occupying his position, at his pleasure, whether the purchase was one made directly from them, or was made by the trustee from himself. See *Ex parte Lacy*, 6 Ves. 627; *Ex parte Bennett*, 10 Ves. 394; *Campbell* v. *Walker*, 5 Ves. 678; *Ex parte James*, 8 Ves. 348; *Shelton* v. *Homer*, 5 Metc. (Mass.) 467; *Davoue* v. *Farming*, 2 Johns. Chy. 252; *Dobson* v. *Racey*, 3 Sandf. 61; *Toney* v. *The Bank of Orleans*, 9 Paige 660, 664; *Van Eppes* v. *Van Eppes*, 9 Paige 238, 242; *Staats* v. *Berger*, 2 C. E. Green (17 N. J.) 297, 306; *Michond et al.* v. *Girod et al.*, 4 How. 503; *The York Building Co.* v. *McKenzie*, 8 Bro. P. C. (Tomlin's ed.) 42, 63; *Scott* v. *Gamble*, 1 Stock. (N. J.) 218, 237; *Johnson* v. *Bennett*, 38 Barb. 250; *Wade* v. *Harper*, 3 Yerg. (Tenn.) 385; *The Aberdeen Railway Co.* v. *Blaikie*, 1 Macq. 4 L. Cas. 461, 479; *Brothers* v. *Brothers*, 7 Ired. Eq. 150; *Patton* v. *Thompson*, 2 Jones's Eq. 288; *Scott et al.* v. *Freeland*, 7 Smed. & M. 409; *Zimmerman* v. *Harmon*, 4 Rich. Eq. (S. C.) 165; *Leisenning* v. *Black*, 5 Watts 303; *Mason* v. *Martin & Kemp*, 4 Md. 124; *Martin* v. *Wyncoop et al.*, 12 Ind. 266; *Spindler et al.* v. *Atkison*, 3 Md. 424; *Michond* v. *Girod et al.*, 4 How. 554; *Buchler* v. *Lafferty's legatees*, 2 Rob.

1879
Special Term.
Newcomb *et al.*
v.
Brooks *et al.*

(Va.) 299; *Barley* v. *Robinson*, 1 Gratt. 9; *Segar* v. *Edwards*, 11 Leigh 213.

The principle upon which these cases all proceed in laying down the broad proposition, that the purchase by a fiduciary of trust-property will be set aside at the instance of the *cestui que trust* or any one occupying the position similar to that of a *cestui que trust* without any enquiry as to the adequacy of the price or fairness of the transaction, is thus stated by Lord Eldon in *Ex parte Lacey*, 6 Ves. 627. "The rule is founded on this : that though you may see in a particular case that the trustee has not made advantage, it is utterly impossible to examine upon satisfactory evidence in the power of the court (by which I mean in the power of the parties) in ninety-nine cases out of a hundred, whether he has made advantage or not. Suppose a trustee buys an estate, and, by the knowledge acquired in that character, discovers a valuable coal mine under it, and locking that up in his own breast, enters into a contract with the *cestui que trust*. If he choose to deny it, how can the court try that against that denial? The probability is, that a trustee who once conceived such a purpose will never disclose it, and the *cestui que trust* will be effectually defrauded.

Justice Wayne in delivering the opinion of the Supreme Court in *Michond* v. *Girod et al.*, 4 How. 555, thus states the reason on which this rule is based : "The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents public and private ; but the value of the prohibition is most felt, and its application is most frequent, in the private relations in which the vendor and purchaser may stand toward each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interests of the other, from the faithful discharge of which duty his own personal interests may withdraw him. In this conflict of interests the law will

interpose. It acts not on the possibility, that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another; and from purchasing on account of another that which he sells on his own account. In effect he is not allowed to unite the two opposite characters of buyer and seller, because his interest when he is the seller or buyer on his own account are directly conflicting with those of the person on whose account he buys or sells."

It is true there are respectable authorities who lay down the rule less stringently and say, that "the rule is that a fiduciary is not permitted to buy the trust-estate or property except when there is the most entire good faith and a full disclosure of all facts and circumstances and an absence of all undue influence, advantage or imposition." See *Krighler et al.* v. *Savage Manufacturing Co.*, 12 Md. 417; *Buel* v. *Buckingham Co.*, 16 Iowa 294, *Saltmarsh* v. *Beene*, 4 Porter (Ala.) 283; *Puzey* v. *Sencer et al.*, 9 Wis. 376; *Faw* v. *Faw's ex'r.*, 1 Hill's Chy. 390; *Coffer et ux.* v. *Ruffin's ex'r.*, &c., 4 Coldw. (Tenn.) 509; *Lovell* v. *Briggs*, 5 N. H. 222. But those authorities which thus qualify the general rule all agree, that a purchase by a fiduciary of trust-property will always be scanned in a court of equity with the most searching and questioning suspicion, and will never be sustained, unless they fully appear to be in all respects fair, candid and reasonable; and the fiduciary must show that he took no advantage whatever of his situation; that he gave to the other party all the information he possessed, or could obtain, upon the subject; that he advised him as he would have done in relation to a third person offering to become a purchaser; and that the price was fair and adequate; and the onus of proving all these things is upon

the fiduciary who purchases the trust-property.   But when we consider the abuses which may attend the purchasing of trust-property by a fiduciary, it does seem to me it is wiser for the law to prohibit such a purchase to the extent of holding, that it may be avoided at the instance of the *cestui que trust*, or person occupying his position, though it may have been made at a fair and adequate price, and the purchase may in all respects appear fair and reasonable, and the conduct of the purchaser just and candid; and the decided weight of authority is in favor of so regarding all purchases made by a fiduciary while he occupies a confidential relation ; and that all such purchases may be avoided at the pleasure of the *cestui que trust*.   And such is the law as held in Virginia.   See *Moon* v. *Hilton et al.*, 12 Leigh 28 ; *Buchler* v. *Lafferty's legatees*, 2 Rob. (Va.) 299 ; *Bailey* v. *Robinson*, 1 Gratt. 9.

Some of the cases, which have been regarded as laying down the less stringent rule, are to be explained on the ground that the court considered that by a fair and clear agreement between the trustee, or other fiduciary, and the *cestui que trust*, the trustee had ceased to occupy a fiduciary relation when he made the purchase ; and these cases may be sustained on sound principles ; but others can not be so explained, but must be regarded as relaxations of the rule, which we think ought not to be allowed.

This rule is not confined to trustees and fiduciaries in the technical meaning of the words, but it extends to every person who is within the reason of the rule, that is, to every person who by his connection with another person, or who by being employed or concerned in his affairs, has acquired a knowledge of his property ; and any such person occupying such confidential relation to another comes within the rule we have laid down.   In other words, the rule embraces every relation in which there may arise a conflict between the duty which the purchaser owes the person with whom he is dealing and

his own individual interest. Thus the rule has been applied to trustees properly so called, as in *Fox* v. *Macbreth*, 2 Bro. C. C. 400, and *Brothers* v. *Brothers*, 7 Ird. Eq. 150; to guardians, as in *Patton* v. *Thompson*, 2 Jones, (N. C.) Eq., 285, and *Scott et al.*, v. *Freeland*, 7 Smede & M. 417; to executors, as in *Michond et al.*, v. *Girod et al.*, 4 How. 503; to agents, as in *Davone* v. *Fanning*, 2 Johns. Chy. 252, and *The York Building Co.* v. *Mackenzie*, 8 Bro. P. C. 42; to directors of a corporation, as in *Abbott* v. *American Hard Rubber Co.*, and *Hodgkinson* v. *The National Live Stock Insurance Co.*, 26 Beav 473; to the cashier of a bank regarded as the agent of the bank, as in *Forney* v. *The Bank of Orleans*, 8 Paige 650; to an administrator, as in *Martin* v. *Wyncoop et al.*, 12 Ind. 266, and *Lovell* v. *Briggs et al.*, 2 N. H. 216; to a factor, as in *Higer et al.*, v, *Savage Manufacturing Co.*, 12 Md. 417; to an auctioneer, as in *Oliver et al.*, v. *Court et al.*, 8 Price 127; to commissioners of bankrupts, as in *Ex parte Bennett*, 10 Ves. 381; to assignees of bankrupts, as in *Ex parte Lacey*, 6 Ves. 627; to a sheriff, as in *Carter &c.*, v. *Harris*, 4 Rand. 204; to solicitors of commissioners in bankruptcy, as in *Owen* v. *Foulkes*, 6 Ves. 630, note and *Ex parte James*, 8 Ves. 337; to attorneys at law, as in *Leisenning* v. *Black*, 5 Wall. 303; and to parties bearing many other relations to each other which may not well be classified, as a creditor of a bankrupt who had been consulted as to the mode of sales *Hughes, ex parte*, 6 Ves. 617; an agent employed by a trustee in managing a sale, as in *Whitcomb* v. *Nunchin*, 5 Med. 91; a mortgagee with power of sale, as in *Downes*, v. *Glagebrook*, 3 Mer. 200; or an annuitant with such power as in *Lewis* v. *Hillman*, 3 Ho. Lo. 607, 630.

In some of the States the courts have hesitated about applying the strict rule we have stated to executors and administrators; and in some they have refused to apply it to the purchase by an executor or administrator, especially to the purchase of personal property. This refusal is based in part on the idea, that an administrator has at

common law a right to appropriate the personal estate to himself by accounting for its appraised or actual value. See *Lyon* v. *Lyon*, 8 Ired. 201 ; *Stollings et ux.* v. *Freeman*, 2 Well's Chy. 401, 409 ; *McCarty et al.* v. *Calhoun et al.*, 17 Ala. 301, 303. But in other States the strict rule we have laid down is applied to executors and administrators, as it is to other fiduciaries. In Virginia the Court of Appeals in *Anderson & Starke* v. *Fox et al.*, 2 H. & M. 245, refused to apply the strict rule we have stated to an executor, who bought personal property at a public sale, apparently on the ground that the practice was so common in Virginia, that to so hold would operate to render voidable the title to a great amount of personal property. Chancellor Taylor of the superior court of chancery of the Richmond District in *McKey executor of Faqua* v. *Young*, 4 H. & M. 430, held that a purchase by an executor of land at a public sale made by himself was not voidable, when the sale was fair and correct. But this decision has been overruled by the Virginia Court of Appeals in *Moon* v. *Hilton*, 12 Leigh 2–28, and *Bailey's adm'r* v. *Robinson*, 1 Gratt. 4–9 ; and in *Michond et al* v. *Girod et al.*, 4 How. 557, the Supreme Court of the United States decided, that no distinction could properly be made between executors and administrators and other fiduciaries, and the strict rule should be applied to them also, and that any purchase by them of themselves must be held voidable at the option of those interested in the estate.

In England the courts have gone further in avoiding purchases made by solicitors and attorneys at law of their clients, than they have of purchases made by other fiduciaries, and have permitted such purchases to be avoided when there was any evidence tending to show that there was inadequacy of consideration or other advantage obtained by the attorney or solicitor, when such sale would hardly have been disturbed, had the fiduciary relation been of any other character, as when the relation of client or attorney would hardly be regarded as embracing

in any manner the property purchased, and when there <span>Special Term</span> had been a great lapse of time before the sale was sought <span>Newcomb *et al.*</span> to be avoided. All contracts between attorneys and so- <span>v.</span> <span>Brooks *et al.*</span> licitors and their clients are viewed with great jealousy and suspicion by the English courts. See *Gresley* v. *Mousley,* 64 Eng. Chy. R. (3 De G. F. & J.) 433; *Austin* v. *Chambers et al.,* 6 Cl. & Fin. 1; *Savory* v. *King,* 5 Cl. & Fin. 626; *Holman* v. *Joynes,* 53 Eng. Chy. R. (4 De G. M. & G.) 270.

It is probable that the English courts have been more jealous and suspicious of all dealings between solicitors or attorneys at law and their clients than the courts of this country would be, as the relation generally between attorneys and clients in England is more permanent and covers more ground than this relation generally does in this country. But upon one point the English and all the American writers I have seen are agreed, that an attorney at law cannot purchase property, real or personal, at a judicial sale, whether made by a commissioner of the court or by a sheriff, after a judgment has been obtained and an execution issued, when his client might sustain an injury by his being a purchaser. See *Sidney* v. *Ranger,* 35 Eng. Chy. Rep. (12 Sim.) side page 718, top page 101; *Leisenning* v. *Black,* 5 Watts 303; *Howell* v. *Baker,* 4 Johns. Chy. 118; *Wade* v. *Pettibone,* 11 Ohio (Stanton) 57; *Stockton* v. *Ford,* 11 How. 247.

In most of these cases the application of the general principle, that an attorney cannot purchase property when his being the purchaser might prejudice his client's rights, have arisen when he purchased the property of the defendant on an execution issued by him for his client. The rule well established in such cases being, that he cannot at a sale under an execution, whether of real or personal property, without the express consent of his client purchase, unless he pays for the property a a sum sufficient to pay off his client's whole debt, or if he has more than one client entitled to be paid out of the property sold, unless he pays for it a sum sufficient

to pay off all his clients' debts, so as to render it certain that they can not suffer by his being a purchaser; and if he does not pay a sum sufficient to pay off all his clients' debts, the sale will be set aside at the instance of any client, though it may have been ever so fair, and an adequate price may have been paid for the property.

The ground of these decisions is thus stated by Kennedy, judge, in *Leisenning* v. *Black*, 5 Watts 304. He says: "The attorney in such case being employed by his clients to collect the amount of the judgment and do the best he can for them in this respect, it is altogether incompatible with those motives of action which ought to govern him, and which alone are suited to secure a faithful discharge of the trust, to permit him to become the purchaser of the property sold under the execution for his own benefit, unless it be for a sum sufficient to cover the whole of his clients' demand. To permit him to buy for his own use at a less sum, without the consent of his clients, would be enabling him to make a gain or profit by sacrificing their interest; because the lower the price, for which he should purchase the property, the greater the advantage in so doing. Such a principle therefore is not to be tolerated. This rule arises from the nature of the relation between the parties, and is alike applicable, however honest and fair the purchase may be; and it is not necessary to enquire whether the purchase is an advantageous one or not, because the fact may be so, and yet not susceptible of being distinctly and clearly proven at the time, or there may be even fraud in it, and the party against whom it has been committed not able to prove it. The rule therefore is founded in principles of public policy; and with a view to protect the interest of those for whom he has undertaken to act, all temptation to do any thing in opposition thereto is removed. There is perhaps no relation in which the confidence is greater than that between attorney and client, and in which the influence over the mind and interest is greater than that possessed by an attorney

over his client. The most implicit confidence is re-

posed in the integrity, skill and discretion of the for-
mer, and that all these will be exerted to the uttermost
of his ability, so far as may be necessary, to accomplish
the end for which he is retained. And though the
sheriff is the agent of the law in making sale of property
taken in execution, and in doing so may be very prop-
erly considered as acting under the authority thereof,
yet the attorney of the party, at whose suit the property
is about to be sold, has a control in regard to it, that may
in many instances be exercised either to the advantage
or prejudice of his clients as he pleases. It may be
advisable for instance, on the part of the attorney,
after the property has been advertised for sale, or after
it has been exposed to sale, for some good reason to post-
pone or countermand the sale, in order to obtain a better
price and make the amount of his client's claim by of-
fering it for sale at a future time; or he seeing at the
time first appointed for the sale that the property was
likely to be sold for a price greatly below its real value
and the amount of his client's debt, might, instead of
countermanding it, urge the sheriff to go on and make
the sale and he become the buyer himself for his own
use."

Like reasons are given for holding the same way in
*Wade* v. *Pettibone,* 11 Ohio. 60. Explaining the rule
we have before stated, the court says. "It is universally
applicable to trustees, executors, agents; and it is no-
where of more forcible application, than to an attorney
purchasing under an execution, when the whole debt is
not paid."

In the case of *Stockton* v. *Ford,* 11 How. 232, 247, the
circumstances were changed, but the same principles of
law applied. There, after the judgment had been recov-
ered by the plaintiff, he was sued by a third party, who
got a judgment against him and sued out an execution
and sold this first judgment; and it was held that with-
out the consent of the client in this first judgment his

attorney in the suit in which it was recovered could not purchase this judgment at the sheriff's sale under the execution. Justice Nelson in delivering the opinion of the court says: "It is true this is not the case of an attorney purchasing property under an execution which he has issued on a judgment, the usual case in which a court of equity has interfered and declared the purchase to have been made in trust for his client; but the principle is the same. He had charge of the judgment, and was intrusted with the management of it for the purpose of collection; and can be allowed to do no act in the absence of the client, by which he may derive an advantage at the expense of the client. Instead of the judgment suppose the plaintiff had charge and management of a plantation and slaves for his client, and an execution should come against them under which they were seized and sold; can it be doubted, if purchased by the attorney in the absence of the client and without his consent, that he could not hold the property discharged of the trust growing out of the relation existing between the parties? We suppose not. A court of equity from the mere fact of such relation would fasten on the purchase a trust, without any enquiry into the motives or intentions of the attorney in making the purchase, and compel him to give up its benefits and advantages on the reimbursement of the purchase-money. Neither fraud nor imposition need be shown. The client may at his election treat the act as done for his benefit. There are few of the business relations of life involving a higher trust and confidence than that of an attorney and client, or generally speaking one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it." In *Moon et al.*

v. *Brochen*, 27 Ill. 23, it was decided when the attorney

of a party becomes the purchaser at a forced sale, he
stands in the shoes of his client, and though the attor-
ney designed to purchase for his own benefit, the client
may claim the purchase for himself. It has been indeed
seriously questioned whether an attorney can purchase
at a sheriff's sale property, even if he give for it the full
amount of his client's debt, so that his client could not
possibly be injured by the purchase; for the defendant
in the execution ought perhaps to be protected from the
injury which might result to him from the plaintiffs' at-
torney, who has the control of the execution and under
whose instructions the sheriff generally acts. It has
been said : "It is dangerous to allow a person, who has
such a material agency in the sale, the capacity of buy-
ing on his own account." See *Howell* v. *Baker*, 4 Johns.
Chy. 120. In *Hall* v. *Halleck*, 1 Cox 134, Lord Thur-
low observed, that "no attorney can be permitted to buy
anything in a course of litigation, of which litigation he
has the management. This the policy of justice will
not endure." But perhaps it may be going too far to say
that an attorney in a suit can buy no property sold in
the suit, though in so doing his client could not possibly
be injured. But the authorities we have cited justify
beyond question the doctrine, that if a client's property
real or personal is sold in the process of a suit, his at-
torney cannot be permitted to purchase it without the
express consent of the client.

The general rule we have laid down, that a fiduciary
will not be permitted to buy the trust-property even
when the purchase is fair and the price adequate, and
that the *cestui que trust* or person bearing a similar re-
lation may at his option set aside such a sale, applies as
strongly to a public sale by a fiduciary as to a private
sale, nor will the fact, that the sale is made under an
adverse proceeding and at a judicial sale, make any dif-
ference. He can with no more propriety purchase at such
a sale than at one made by himself. *Elliott* v. *Poole*, 3

Jones Eq. 17 ; *Jameson* v. *Glasscock*, 29 Mo. 191 ; *Martin* v. Wyncoop, 12 Ind. 206 ; *Hoitt* v. *Webb et ux.*, 36 N. H. (5 Fogg) 158 ; *Jewett* v. *Miller*, 10 N. Y. 402 ; *Chandler* v. *Moulton*, 33 Vt. 245. The reason of this is obvious ; for if the purchaser bears such a relation to the persons interested in the property to be sold as to impose on him the duty of making the property bring the highest price possible, this duty is as incumbent on him when the property is sold under an order of the court or by any other person or at any other sale, as it is when made by himself either privately or publicly ; and therefore he cannot be permitted to put himself in a position in which it is his interest that the property should bring the least sum possible.

In the application of the principle we have laid down it makes no difference, whether the fiduciary stands alone or is one of many who occupy the same fiduciary relation. Each fiduciary has no more right to purchase from his co-fiduciaries, than he would have to purchase from himself if he alone occupied the position. See *Aberdeen Railway Co.* v. *Blakey*, 1 Macq. H. L. Cas. 461, 473 ; *The Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553 ; *The Hoffman Steam Coal Co. of Alleghany County* v. *The Cumberland Coal and Iron Co.*, 16 Md. 456 ; *Holcomb* v. *Holcomb*, 3 Stock. (N. J.) 231. The rule we have laid down extends not only to the fiduciary but also to his agent to sell, because it is his duty to act as the fiduciary himself is bound to act. See *Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553 ; *Rennick* v. *Butterfield*, 31 N. H. 90 ; *Banks* v. *Judah*, 8 Conn. 157 ; *Copeland* v. *Mercantile Insurance Co.*, 6 Pick. 204.

In all cases, where the rule we have laid down applies, the purchase by the fiduciary is not absolutely void but only voidable by the *cestuis que trust* or person occupying a similar position. The rule was adopted for their benefit, not for that of the fiduciary or of other persons ; and only they can have the benefit of it by avoiding the purchase made by the fiduciary at their option, but if there

are several occupying the position of *cestuis que trust*, one 1879
Special Term.
——————
Newcomb *et al.*
v.
Brooks *et al.* may have the sale vitiated, though the others are content with it; *Davoue* v. *Farming*, 2 Johns. Chy. 252, 268; *Thorp* v. *McCullum*, 1 Gilman (Ill.) 627 ; *Baldwin* v. *Allison*, 4 Minn. 30.

The principles we have laid down apply not only to every description of fiduciary, but they are broad enough to include any one, who obtains a knowledge of one's affairs while acting in a subordinate capacity under a person who occupies a fiduciary relation to him; thus a clerk of an attorney at law bought of the client a bond, which had been left with the attorney for collection under circumstances which, while suspicious, might not have vitiated the sale but for the confidential relation between the parties; and the sale was on that account set aside. See *Poellon* v. *Martin*, 1 Sandf. 569. And the clerk of a broker employed to sell lands, and who had access to the correspondence between the vendor and the broker, has no more right to become a purchaser of the land than the broker would have. *Garden* v. *Ogden et al.*, 22 N. Y. 327.

The principles we have stated apply to all persons holding confidential relations of any description in all their strictness and force, only when the purchase is made by the fiduciary while the confidential relation between him and the vendor is still in existence. The rule of law, which prevails when the purchase is made after the confidential relation has ceased to exist, is thus stated by Lord Eldon in *Ex parte Lacey*, 6 Ves. 626. He says: "Although a trustee, who is intrusted to sell or manage for others, undertakes, at the same moment in which he becomes a trustee, not to manage for the benefit and advantage of himself, it does not preclude a new contract with those who have intrusted him. It does not preclude him from bargaining that he will no longer act as trustee. The *cestui que trust* may, by a new contract, dismiss him from that character, but even then that transaction, by which they dismiss him, must according

to the rules of the court be watched with infinite and most guarded jealousy ; and for this reason : the law supposes him to have acquired all the knowledge a trustee may acquire, which may be very useful to him, but the communication of which to the *cestui que trust* the court can never be sure he has made when entering into the new contract by which he is discharged." And in *Coles* v. *Trothick,* 9 Ves. 234, Lord Eldon again lays down the law substantially the same, though in different language. He says: "A trustee may buy from a *cestui que trust,* provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, that the *cestui que trust* intended that the trustee should buy, and there is no fraud, no concealment, no advantage taken by the trustee or information acquired by him in the character of trustee. I admit it a difficult case to make out whenever it is contended that the exception prevails."

The law I take to be, that if the trustee proves clearly that he gave to the *cestui que trust* all the information about the property and its value which he possessed, and with the consent of the *cestui que trust* ceased to be a trustee, and deals directly with the *cestui que trust* without taking any sort of advantage of him, and gives him an adequate price for the property, such a purchase cannot be set aside by the *cestui que trust,* provided the transaction is proven to the entire satisfaction of the court to have been of this character after a jealous and scrupulous examination of all the circumstances.

If a fiduciary of any sort, in violation of the rule we have laid down, purchases from the *cestui que trust* the trust-property, and then re-sells it to a *bona fide* purchaser without notice, before the *cestui que trust* applies to the court to set aside the purchase by the trustee of the trust-property, the original sale made to the fiduciary cannot be set aside; and the only remedy then left the *cestui que trust* is to demand of the fiduciary personally an account of the profit he made by the re-sale, and the court will

require him to pay over such profit, if he made any. But if the purchaser from the fiduciary has notice or knowledge of the facts which vitiate the purchase by the fiduciary, the court will set aside the sale, though the purchaser from the fiduciary paid full value. See *The Hoffman Steam Coal Company of Alleghany County* v. *The Cumberland Coal and Iron Company*, 16 Md. 456 ; *Langams et. al.* v. *Boyson*, 8 Binn. (Pa.) 58 ; *Bobbins* v. *Bates*, 4 Cush. (Mass.) 104 ; *Jackson* v. *Walsh*, 14 Johns. 407 ; *Hawley* v. *Cramer*, 4 Cow. (N. Y.) 748 ; *Ward* v. *Smith et al.*, 3 Sandf. (N. Y.) side page 592, top page 645. And even when the property remains in the hands of the fiduciary who has purchased it, the *cestui que trust* must institute his suit in equity in a reasonable time, asking the court to set aside the sale, or the sale will not be set aside.

We will now apply the law as we have stated it to the facts presented by the record before us. Donally's administrator made a deed on January 12, 1865, to Buchanan and West conveying three thousand five hundred and sixty-six and two thirds acres of land in Kanawha county, West Virginia. The conveyance, though nominally to them in fee simple, was really in trust for themselves and a large number of others who together paid the purchase-money ; and they subsequently let in a large number of others as equal partners in the transaction. The owners of this land formed themselves into a corporation under the laws of Ohio, where a large portion of them resided, to bore for oil. They tried the experiment, and it was a failure, no oil being found ; and in less than a year they formally dissolved the corporation, and authorized Buchanan and West, the trustees, to sell this land, limiting them in the price to be taken to $15.00 per acre. This was done January 1, 1866. Buchanan and West purchased this tract of land for themselves and the other owners, and were the sole managers of it from the beginning, superintending the efforts to discover oil, paying the taxes, and in all respects managing the property for the other owners. They had

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

no knowledge of it, except to the extent that information was furnished them by the trustees and agents, Buchanan and West; and they furnished to them but little information. Everything relating to the property was entrusted to them; and no supervision of them was taken by the other owners. While this agency was in full operation, between March 23, 1866, and September 11, 1870, these trustees and agents severally purchased of the other owners severally ·twenty-two fifty-sixths of this tract of land, they say. They produce no evidence except simply their own statements of their having made these purchases; and they simply say they bought their several interests for one tenth of the price the owners had paid, and state none of the circumstances under which they purchased.

They come obviously within the rule we have laid down; and all of these sales to them may at the mere option of the several parties they purchased from be set aside, unless a case is made out utterly different from what now appears. Indeed it would seem almost impossible with the facts admitted in the record before us for the trustees to prove any facts that could prevent these owners of the land severally from setting aside the sale of their shares to them, if they desire so to do. Four of them, plaintiffs in this suit, express the desire to set these sales aside. None of the other eighteen owners who so sold out their shares have been heard from, none of them having been made parties to any of these suits or proceedings, and all of them being non-residents, and most of them probably ignorant of the pendency of the suit·

Brooks, in his original bill, filed April 1, 1871, calls upon Buchanan and West, the trustees, "to disclose the names and interest of all the owners of said land; that they disclose how many interests and shares they have acquired from their *cestuis que trust*, and at what price;" and they ask "that the interest of all the owners in said land be established by the court." In their answers Buchanan and West admit fully their fiduciary relation

to all the owners of said land, including those of whom they claim to have purchased; but they do not give the owners, whose shares they say they purchased while acting as agents and trustees, or the price they paid for their shares. They simply say they acquired twenty-two fifty-sixths of this tract of land "by purchase from the several owners thereof for a consideration satisfactory to said owners, and in which transaction the plaintiff Brooks has no interest or concern." And though they make their answer a cross bill, they do not make defendants of any of the eighteen owners of this tract of land, whose interest they claim to have purchased; nor do they file any evidence of their several purchases.

It is clear that these eighteen persons or their heirs and devisees, if any of them be dead, were necessary parties to both the original suits by Brooks and this cross-suit by Buchanan and West, both of which asked a sale of this tract of land by the court. It is true, that on the principles of law we have laid down, Brooks had no right to ask to have these purchases by Buchanan and West of other owners of this tract of land set aside; but the answers and depositions of Buchanan and West having disclosed to the court clearly that there were eighteen parties who were original part owners of this tract of land, and there being no deeds from them produced, and no assignments or transfers of their several interests, it was clearly the duty of the court, before declaring that Buchanan and West severally owned all the interests of these eighteen parties and ordering a sale of the tract of land, to require that these eighteen parties, their heirs or devisees, should be made defendants to both Brooks's original bill and Buchanan and West's cross-bill.

When the decree of sale of this land was entered, November 15, 1871, the record clearly showed that all the claim that Buchanan and West set up to be the owners of these twenty-two fifty-sixths of this land, purchased as they said from these eighteen owners, was that while they were acting as trustees and agents for them, they

had bought these shares from them at one tenth of what the shares cost them. This gave full notice to any purchaser of this tract of land under this decree, that to the extent of twenty-two fifty-sixths of this land these eighteen persons had a right to have these sales severally to these trustees severally set aside, if they chose. And purchasing with this full notice of this equity of these eighteen persons who were not parties to the suits, the purchaser under this decree could have got no title to twenty-two fifty-sixths of this land as against these eighteen parties, had they afterwards asked to have their sales to the trustees nominally set aside. The purchaser could of course only acquire such title as the parties to the suits owned; and having notice by the record that there was an equitable title to twenty-two fifty-sixths of this land in these eighteen persons not parties to the suits, if they chose to claim their shares, the purchaser must have taken the land subject to this equitable claim of these eighteen persons. The authorities we have cited clearly sustain this as law. Brooks and one of the counsel of Buchanan and West, who actually purchased this land under the decree in these suits, must clearly be held to have actual notice of the facts which gave the eighteen parties an equitable claim on this tract of land; and by the sale and deeds made them they certainly got a very precarious and unsatisfactory title to the twenty-two fifty-sixths of this land, dependent as it is apparently on the will and pleasure of these eighteen persons to render it worthless; and indeed any one of them has to the extent of his share the power to destroy the interest of these purchasers in this land. The authorities we have cited make this clear.

Nor does section 8 of ch. 132 of the Code of West Virginia render the title of the purchaser, Brooks, any better. It simply provides that the setting aside or the reversal of the decree of sale shall not affect the title of the purchaser after the sale is confirmed. But the title of the purchaser, Brooks, in this case is defective and

practically valueless as to twenty-two fifty-sixths of this land, though the decrees of sale were never set aside or reversed. For this decree of sale, like any other decree, is totally inoperative on the rights of persons who were not parties to the suits in which the decree was rendered, if those rights had been a legal title to any part of the land; and when, as in this case, it is an equitable one, the decree is also totally inoperative for the protection of a purchaser having at the time of his purchase full notice of their equitable rights. The provision in our Code, referred to and relied on by the purchaser as making his title good, cannot possibly have any effect in transfering in any case to the purchaser the title of persons who are not parties to the suit. These rights must remain entirely unaffected by this provision in our Code. The court therefore made an obvious mistake in determining that Buchanan and West owned these twenty-two fifty-sixths of this land, and in rendering a decree for the sale of this tract of land before these eighteen persons were made parties to these suits. The decree of sale, it is true, is not a nullity, but under it a purchaser, and especially a party to the suit, could get a good and safe title to only thirty-four fifty-sixths of this land, and it should therefore not have been rendered.

The principal question in this case will now be considered, that is: Ought the decree of October 31, 1872, confirming the sale by the commissioners to Brooks, be set aside in this suit as fraudulently or improperly procured from the court? The allegation in the bill in this suit is, that Brooks knowing that the owners of this tract of land were all non-residents brought his suit with the assent and approbation of the trustees, Buchanan and West, and for the sole purpose of obtaining a decree to sell the land, and to purchase it at a great sacrifice, and thus to defraud the other owners out of their land; and that Buchanan and West gave their concurrent assent to this fraudulent scheme of Brooks, as by the suit they would get their fraudulent purchases of these twenty-two

shares of this land approved, and their interest would thus be greatly promoted, even if the land was sacrificed, as they would in the absence of the parties interested get nearly half of the proceeds of the sale; and that as it was, though the land was sacrificed, yet they by their speculation in buying these shares fraudulently at one tenth of their value, actually realized a profit of nearly eight thousand dollars.

This charge, that Brooks with the concurrence of the trustees brought this suit for the sole purpose of buying this tract of land at a great sacrifice, and that the consideration moving the trustees to assent to this fraudulent scheme was, that they might quietly get their speculation in buying fraudulently these twenty shares for almost nothing affirmed, is entirely unsustained by any evidence. There is nothing in the record to show that Brooks did not bring his suit in good faith, and with the legitimate purpose of having his interest in this tract of land recognized and established by a decree of the court, and the land sold that he might realize his interest; or that there was any improper understanding or agreement between him and the trustees, or indeed any agreement or understanding of any description between them, when the suit was instituted. On the contrary the bill on its very face shows that there could not have been such an understanding as is charged between these parties.

This bill makes charges of improper and fraudulent conduct on the part of the trustees, and among other things seeks to hold them to an account for the funds which had come into their hands as trustees. It also calls upon them to disclose how many interests and shares they had purchased from their *cestuis que trust* and at what price, and asks that the interest of the true owners of this land might be established by a decree of the court. Had the trustees in obedience to this demand given the names of the parties of whom they had purchased, and had the interest of the true owners been established by the court as the bill prayed, Buchanan and

West would in all probability have lost their entire speculation in the purchase of these twenty-two shares of their *cestuis que trust*. It is thus obvious on the very face of Brooks's bill, that he neither then had nor expected to have the concurrence of these trustees in his buying in this tract of land at a great sacrifice in consideration of his letting them quietly make their speculation out of these eighteen non-residents. Nor is there any evidence of any subsequent arrangements of this character between them. On the contrary it is clear, that when this tract of land was first advertised by the commissioners for sale on the 18th of May 1872, there was no concert of action between Brooks and said trustees with reference to the purchase of said tract of land at the sale. On the contrary, within a week of the time they expected this tract of land to be sold, we find these trustees and Brooks each severally, and without the knowledge of the others, making arrangements each for themselves to buy in this land, the other by such arrangements being excluded from any participation in the purchase.

A little more than a week before this sale was to take place Harris, representing himself and seven other part-owners of this tract of land, goes to Charleston, Kanawha county, West Virginia, to urge upon the commissioners to postpone the sale of this land, it being in their judgment liable to be sacrificed if sold at the appointed time. The commissioners refused to postpone the sale, they doubtlessly thinking that the land would then bring a fair price. We have a right to assume that the trustees as well as Brooks were informed of this refusal, as the commissioners were of the counsel for the trustees and of Brooks, one of them being of the counsel for each of these parties. Accordingly we find each of them acting as though he expected the sale to take place at the appointed time, May 18, 1872. And we find the trustees, being advised by their counsel, Ferguson, in Cincinnati, that being trustees and confidential

agents of the other owners of this tract of land, they could not legally purchase this tract of land for themselves at the public sale then expected to be made in about a week, undertook under the advice of their counsel to get a third party, Schiff, to attend the sale and with funds furnished by the trustees to buy the land for them, their agent, Schiff, to have an interest in the speculation for his share in the transaction.

The counsel of Buchanan and West, Ferguson, was unquestionably right in advising them that their duty as trustees and agents for the sale of this land precluded them from being purchasers of it at this sale to be made by the commissioners. For, as we have seen, they had no more right to become the purchasers at this public judicial sale, than they would have had to purchase it at public sale made by themselves. In either case their confidential relations to the other owners of this tract of land, made it their duty to use every effort to make this land bring the highest possible price; and therefore the law would not permit them to put themselves in a situation which would make it their private interest to violate their duty and cause the land to sell at the lowest possible price. There were but two ways by which they could have become purchasers of this land; one by getting in advance the leave of the court to become bidders at this sale, if the court thought it proper to give them such leave in this particular case, and the other in t e words of Lord Eldon: "By bargaining with the *cestuis que trust* that they would no longer act as trustees. The *cestuis que trust* must by a new contract have dismissed them from that character." And the evidence required to sustain a contract that these trustees might buy, must be very clear. According to Lord Eldon: "it must be ascertained too that there was no fraud, no concealment, no advantage taken by the trustees of information acquired in that character, and all this must be ascertained after a jealous and scrupulous examination of the cir-

cumstances, and the whole transaction must be watched with infinite and most guarded jealousy."

There is not in this case even any pretence that leave to become bidders at the sale was given by the court, nor is there one particle of evidence of such a contract or understanding with the *cestuis que trust.* The only possible pretext for inferring such an understanding is the filing of the bill by Brooks and the cross-bill by the trustees asking a sale of the land by the court. If the writs in these suits had been actually served on all the *cestui que trust*, it could not possibly have had the effect of a contract dismissing these trustees from that character and agreeing by the *cestuis que trust* that they might be bidders at the sale; for, as the authorities we have cited show, it would have still been their duty to use their best efforts to procure the highest price for this land, though it was sold by commissioners of the court. But the summonses in these suits were not served on any of the *cestuis que trust*; and a majority of them knew nothing of the character of the suits, while a number had never heard of their institution. So far as they knew, the trustees were still acting as their agents to sell this tract of land privately, in pursuance of the authority conferred on them by their resolution of January 1, 1866. And as they had been advised by counsel that they could not, without a breach of good faith, become the purchasers of this land at this sale, their effort to get a third person to buy the land in his own name can only be regarded as an attempt to commit a gross and positive fraud on their part. This third party did not accept this proposal of theirs at the time it was made, but took it under advisement and ultimately declined to act in the matter, advising that some other person be substituted for him.

While Schiff had this proposition under advisement, Smith, one of the counsel for these trustees, and Brooks were entering into a contract to buy this land jointly at this sale, an arrangement as illegal as that which the trustees were then endeavoring to make. Brooks stood in

no confidential relation to any of the owners of this land, and he had therefore a perfect right to be a bidder at this sale by the commissioners, and, if he chose, to buy this tract of land. This agreement is dated May 14, 1872, only four days before it was expected that the land would be sold. It is obvious on the face of this agreement that Smith, one of the counsel of the trustees, and Brooks had neither of them heard of the injunction to stop this sale which Harris had obtained three days before, on May 11, 1872. The contract between Brooks and his brother-in-law, Smith, was doubtless entered into at Cincinnati, where Brooks was confined to his home there by sickness; and as it stipulates that the land should be bought for the joint use of Brooks and Smith at the sale stated by the contract to be made on the 18th of May, it is obvious that they had not then heard of this injunction which had been granted a few days before in West Virginia. It is equally obvious that this contract between Brooks and Smith, the counsel of the trustees, for the purchase of this land was made without the knowledge or consent of these trustees, for they too were then engaged in endeavoring to make a private arrangement, whereby the land was to be bought for their own benefit. Smith, without the consent of his clients, certainly had no right to become the purchaser of this land, and of course no right to enter into this contract with Brooks to purchase it jointly with him. The authorities we have cited show that the law forbids him to buy this land, though sold at a judicial sale, without the consent of his clients.

In the language of Kennedy, judge, in delivering the opinion of the court in *Leisenning* v. *Black,* 5 Watts. 304, slightly modified, "to permit him, without the consent of his clients, to become the purchaser of the property is altogether incompatible with those motives of action which ought to govern him and which alone are suited to secure a faithful discharge of his trust. To permit him to buy for his own use, without consent of his clients, would be enabling him to make a gain or profit

by sacrificing their interests; because the lower the price, for which he should purchase the property, the greater his advantage in doing so. Such a principle is therefore not to be tolerated. This prohibition of his purchasing for his own use arises from the nature of the relation between the parties, and is applicable, however honest and fair the purchase may be. It is not necessary to enquire whether the purchase is an advantageous one or not; because the fact may be so, and yet not be susceptible of being distinctly and clearly proven at the time; and there may be even fraud in it, and the party against whom it has been committed be unable to prove it. The rule therefore is founded in principles of public policy and with a view to protect the interest of those for whom the party has undertaken to act, and therefore all temptation to do anything in opposition thereto is removed. The most implicit confidence is reposed in the integrity, skill and discretion of the attorney, and that all these will be exerted to the utmost of his ability, so far as may be necessary, to accomplish the end for which he is retained. And although the commissioners are the agents of the court in making the sale, yet the attorney of the parties, at whose suit the property is to be sold, has a control in regard to it, that may in many instances be exercised either to the advantage or prejudice of his clients, as he pleases. It may be advisable for instance, on the part of the attorney, after the property has been advertised for sale, for some good reason to postpone the sale, in order to obtain a better price by offering it for sale at a particular time; or he seeing at the time it is offered for sale, that the property was likely to be sold for a price greatly below its real value, might instead of countermanding it urge the commissioners to go on and make the sale, and he become the buyer for his own use."

Is it possible to know that what is here surmised by Judge Kennedy did not actually occur? Might not Smith have urged the commissioners of sale, one of them his partner, to go on and make this sale and not

1879
Special Term.

Newcomb *et al.*
v.
Brooks *el al.*
postpone it, as certain of the parties in interest urged
should be done? Might not this have been done with
a view to his purchasing it at a very low price? It is
true there is no evidence of this sort in this case; yet
the first may be so, as Judge Kennedy well says, and
yet not be susceptible of being proven. Had he so
urged, his advice would naturally have had great influence
with his partner, one of the commissioners for sale, for
he would take it for granted that the advice was given
to promote his client's interest and to get the best price
possible for the land. It is true, that when the commis-
sioners refused to postpone this sale, he had made no
contract to purchase. But who can say he did not con-
template making such contract? It was made in four
days afterwards.

When the land was subsequently decreed to be sold,
the court directed it to be advertised only in a county
newspaper instead of as before in a city newspaper. Of
course this change was made at the suggestion of some
counsel; and whose advice would the court be more
likely to regard? The advice of Smith, the counsel for
the trustees, whose duty it was to obtain the largest pos-
sible price for the land, and who had a much larger per-
sonal interest in the property bringing a high price than
any other party in the suits. If he advised or suggested
that it was unnecessary and a useless waste of money to
advertise the land in a city paper, the court, supposing
he had his client's interest at heart and knew best what
would promote that interest, would naturally adopt his
suggestion; and yet this counsel, Smith, had, without
the knowledge of the court, put himself in the posi-
tion to make his own personal interest and that of his
client conflict. Can this be tolerated by a court of
justice? It is true, that there is no evidence that Smith
used his influence to get the court to modify the decree
of sale so that the land would not be advertised in a
city newspaper; but if he did so use his influence, the
record of course would not show it. The judge himself

could not in one case in a hundred remember at the next court under what or whose advice such a modification in a decree was made. Though no fraud is proven in this case, still it illustrates well the propriety of the rule of law, which we have seen the courts have adopted, of prohibiting as a matter of public policy an attorney from purchasing property at a judicial sale in which his client is interested without his client's consent, whenever the purchase by him could possibly injuriously affect his client's interest. And the circumstances of this case tend strongly to countenance the propriety of the more stringent rule, which we have seen some of the courts countenance, which forbids an attorney to purchase at any judicial sale, though his client can not be prejudiced, or though done with his express consent, because even then such permission to a purchaser might tend to the injury of other parties to the suit and might induce the attorney to act oppressively and unjustly to them and deceitfully and unfaithfully to the court or its officers.

Whatever may be regarded as the proper rule to adopt with reference to permitting an attorney with the consent of his client to bid generally at a judicial sale, it seems to me obvious that in the present case the attorney for the trustees, Buchanan and West, ought not to be permitted to so bid, even had they expressly given their assent. If Buchanan and West had given their assent to their counsel, Smith, to enter into this contract with his brother-in-law, Brooks, to purchase this property at the public sale by the commissioners, they would have violated their duty to their *cestuis que trust* as clearly as they would have done by purchasing the property themselves. It was then their duty to their *cestuis que trust* to use their best efforts to procure the best possible price for this property, which had been confided to their care with full authority to sell or otherwise manage. The trust imposed on them would have been obviously violated if they had given their consent that their attor-

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

ney, who from his position necessarily had so much control over the sale of this property, should himself become a purchaser. By so doing, they would have authorized their attorney to put himself in a position wherein it became his personal interest that the property should be sacrificed. Their permitting their counsel to take such a position would probably tend more to the injury of the interest of their *cestuis que trust,* which they were bound to protect, than if they had themselves become bidders for this property; because from the position of their counsel, Smith, he could if so disposed do more injury to the *cestuis que trust* in this sale by the commissioners, than the trustees themselves could probably have done by being bidders. Smith therefore could not in this case, even with the assent of his clients, have properly made this contract with his brother-in-law, Brooks. Much less could he properly have done so without their consent or knowledge, as he did. And Brooks knowing that his brother was the counsel for these trustees, could not properly enter into such a contract with him, though he had himself a right to purchase the property. He had no right to put the counsel of other parties in a position in which he might be tempted to betray their interest to promote his own.

Smith in his answer says: "He fails to see any impropriety in bidding at a judicial sale and thus advancing the price of articles which a client is interested should bring the highest possible price." The impropriety consists in putting himself in a position, in which it becomes his personal interest that the property should bring the lowest possible price. If attorneys so act, they deliberately put themselves in a position, in which their duty and their interest come into direct conflict; and the law will not on principles of public policy tolerate this, as attorneys may be thus tempted to violate their duty; and if they did, and so wronged their clients, it would be very difficult, if not impossible, to establish the wrong done by proof.

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

The conduct of the commissioners, Quarrier and Knight, is assailed in the bill. There is nothing in the record which shows any impropriety of conduct on their part. There was no impropriety in the court's appointing them special commissioners to sell this tract of land, or in their accepting the appointment and acting in that capacity. Their clients had a larger interest that this tract of land should sell for the highest possible price than any other parties to the suit. It is usual for the courts in this state to appoint the attorneys of parties, whose interest it is to get the highest price for the land, the commissioners to sell it; and we see no reason why this practice on the part of our courts should be changed. The commissioners when so appointed have as it were a double motive to the just and full performance of their duty. Their own individual interest accords with the interest of their client; and both are promoted by the sale of the property at the highest possible price.

These commissioners were suspected by some of the plaintiffs in this suit of being actuated by improper motives in refusing to postpone the first sale on the application of Harris. But there was no ground for such suspicion. The property had been extensively advertised at a cost of $165.00. They had no motive, either as counsel or as commissioners, to have any other desire than that the property should bring the highest possible price. They had no knowledge of any combination or arrangements by any one which would have tended to depreciate the price at which the property would probably sell; and in fact the combinations and arrangements made by the trustees and by Brooks and Smith, which had this evident tendency, had not then been made; and they no doubt exercised their best judgment, when they refused to postpone this sale. They may perhaps have been influenced by the advice of Smith, but of this there is no evidence; and perhaps Smith contemplated then buying the property, as a few days thereafter he entered into an agreement with Brooks to do so; but if

this be so, and they were in point of fact so influenced, no blame could be attached to these commissioners. Smith was counsel for parties who the court had decided were entitled to more than forty-six per cent of the proceeds of the sale; and the commissioner might well have relied on his judgment on the question whether the property ought to be then sold; and certainly they had no right to suppose that his advice, if he gave any, urging the sale could be biased by any self-interest in conflict with the obvious interest of his clients. The conduct of these commissioners at the sale that was actually made was all that could be reasonably expected of any commissioners.

It is true that the property was knocked down at a price not over half its estimated value, taking the opinion of the witnesses who were examined as our guide as to what was its then value; but these commissioners had no detailed or special knowledge of the value of this tract of land, the price at which they knocked it down, $21,500.00, was within $4,500.00 of the price which shrewd business men residing in the county, and probably well aquainted with its value, had sold the land for on the 12th of January, 1865, at a time when the price of property of that character was high. A. Donnally, administrator, had sold it at that time for $26,000.00. It is true that very shortly thereafter a large part of it had been sold at the rate of $50,000.00; but this sale was to a large number of parties, none of whom paid over $2,000.00 of the purchase-money, and who bought it believing that it would yield large quantities of oil, and this was the sole inducement for paying this price. The experiment had been fairly tried to their satisfaction; and it was ascertained that no oil could be found in this tract of land. The commissioners, after advertising the land in the manner directed by the court, offered it for sale on the 26th of October, 1872; they had a number of bids for the property, the highest bid being $17,000.00. Being unwilling to take this price, and supposing a higher bid might be

made, they adjourned the sale for two days. The land was cried from ten o'clock A. M. till nearly sundown, there being numerous bids made during the day, the highest bid then offered being by Brooks, $21,500.00. They again adjourned the sale till the next day for the express purpose of allowing some bidders, who were competing with Brooks, an opportunity of making a personal examination of it. They made such examination, and when the property was again put up, at two o'clock P. M. the next day, they declined to bid any more. It was cried till nearly sunset, and no other bid being made, it was knocked down to Brooks. It had only been advertised at that time in the county paper. It may be, that had it been then advertised in some city newspaper, it might perhaps have brought a higher price; but the commissioners were not authorized to advertise it except in the county paper. An advertisement in a city paper would have cost $150.00; and as the court had modified the former decree, and directed its advertisement in a county paper only, the commissioners would not have been justified in advertising it in a city paper. The terms of the sale were complied with by the purchaser; and the commissioners reported the sale to the court; and it seems to me clear, that under these circumstances no blame can be attached to them, even as wanting in sound judgment in accepting this bid and reporting the sale to the court.

On the second day after this sale, there being no exception to the report of the commissioners, this sale was confirmed, and a deed ordered to be made at once to the purchaser, Brooks. The question is, whether on the application of eighteen of the owners of this land in the bill in this cause to set aside and annul this decree as fraudulently or improperly obtained from the court the circuit court ought to have set it aside, or whether it ought to have done, as it did by the decree of November 27, 1874, dismiss the plaintiffs' bill at their costs. The court, having in view of the facts upon which it acted,

1879
Special Term.

Newcomb et al.
v.
Brooks et al.

1879
Special Term.

Newcomb *et al.*
v.
Brooks *et al.*

no reason for believing that this sale was not satisfactory to all the parties interested, did not perhaps err in confirming this report so speedily. One strong reason doubtless for the inference by the court, that all parties interested in these suits were satisfied with this sale, was, that the counsel of Buchanan and West did not except to the report of the sale. They according to a previous decree of the court were entitled to more than forty-six per cent of the proceeds; and if they, or rather their counsel, for they were not there, were satisfied with the sale, it furnished the court very strong reason for believing that the sale should be confirmed.

But if the fact had been made known to the court by Smith, one of the counsel of these trustees, Buchanan and West, that he was one of the purchasers of this property in conjunction with his brother-in-law, Brooks, with whom his clients, the trustees, had been carrying on the principal controversies in these suits, and that his clients did not know that he had made any arrangement with Brooks to purchase this land jointly with him, and that none of the *cestuis que trust* were aware of any such arrangement, or that he was a joint purchaser of the lands with Brooks, it is obvious that the court ought not to have confirmed this sale, until ample opportunity had been given to Buchanan and West and each of these *cestuis que trust* to ask to have this sale set aside; for we have seen, if any of them objected to this sale, it ought under these circumstances to have been set aside without regard to the price that had been paid for the land, it being the right of any of these parties to set it aside at their option. Had this opportunity been afforded them, it is obvious that this sale would never have been confirmed, as no less than eighteen of these *cestuis que trust* offered a petition to the court at its next term, and doubtless as soon as they could after they heard of this sale and learned the real facts. These facts were made known to them by Smith putting on record a deed for one moiety of this tract of

land. Which deed was recorded November 25, 1872, about four weeks after the sale had been confirmed; and it recited the fact that Brooks and Smith had entered into this agreement to purchase this land jointly, and gave the date and substance of the contract, and stated that the purchase had been made in Brooks's name but jointly for him and Smith, pursuant to this agreement.

The omission of Smith, the counsel of the trustees, to inform the court of these important facts, though unintentional, it seems to me furnishes ample reason for setting aside the decree, as the conclusion of law under such circumstances is that it was fraudulently procured. It is insisted however that this objection to this sale, and therefore to this decree, can only be urged by the trustees, Buchanan and West, whose counsel only Smith was. Some judges, we have seen, think that the only safe rule for the courts to adopt is, to prohibit an attorney in a suit from bidding for property sold under a judicial decree in the suit, even though his client expressly and with full knowledge of all the facts assents to his purchasing, believing that this rule is essential to obtaining fair sales and doing justice to other parties to the suit. There is much strength in this view; but it may be perhaps too stringent a rule, and we do not mean to decide in this case whether or not this is the proper rule, as it is unnecessary for us in this case to express an opinion on this point. It would be necessary to determine it, if Buchanan and West had not been trustees and confidential agents of the other owners of this property; but being such, they could not, as we have seen, have assented to their counsel purchasing this property at this sale without a breach of faith on their part to their *cestuis que trust;* and of course they cannot in this suit, as they have done by their answers, waive any objection to the purchase of the land by Brooks and their attorney, Smith, without a breach of faith to their *cestuis que trust.* In other words, the consent of their *cestuis que trust,* ob-

1879
Special Term.

Newcomb  *et al.*
v.
Brooks *et al.*

tained after the fullest information and in the fairest manner, was necessary to enable these trustees to purchase this property; and like consent on their part was at least as necsssary to enable Smith to be a purchaser at this sale; and these *cestuis que trust* have therefore a right to set aside in this suit this decree confirming this sale, as Smith, the counsel of their trustees and confidential agents, was a secret party to the purchase, which for that reason ought not to have been confirmed by the court, and would not have been, but for the improper suppression and concealment from the court of the fact that he was interested in the purchase.

I do not mean to be understood as expressing the opinion that either Smith or Brooks, in entering into their contract to purchase this land, or in purchasing the same, or in failing to make known to the court at the time this sale was confirmed that Smith was a party to this purchase, designed to do any intentional wrong to any one. On the contrary, it is obvious that in all these things they thought they were doing what they had a legal right to do without the consent or approbation of the trustees or of any of the *cestuis que trust*. Persons who intend to commit a fraud never put upon the record of the court their fraudulent conduct. And the fact that Smith and Brooks voluntarily and unnecessarily inserted in the deed from Brooks to Smith the whole of these transactions, which we deem improper, shows clearly that they were not conscious in their transactions of doing any wrong to any person. But their ideas of propriety cannot be the guide of the courts. These transactions are set aside and condemned, not because they were actually fraudulent on their part, but because it is contrary to public policy to permit them to stand and be effective.

In the bill in this cause the plaintiffs not only ask to have this decree of confirmation set aside and annulled, as improperly obtained from the court, but also to have declared null and void the purchases of the trustees, Buchanan and West, from their several *cestuis que trust,*

and also to require them to settle their accounts; but

nothing can be properly done in this cause, except the nullifying of this decree of confirmation and the decree and deeds based upon it, and all other things prayed for by the plaintiffs being foreign to the only proper object of this suit, and being things which ought to be done, if done at all, in the suits of *Brooks* v. *Buchanan and West et al.*, and *Buchanan and West* v. *Brooks et al.*, now pending in the circuit court. See *Manion* v. *Fahy,* 11 W. Va. 500. In those suits, all the proper parties having been first made defendants, the court should determine on the evidence, which is now in or may be hereafter brought into said suits, whether on the principles laid down in this opinion said purchases claimed to have been made by the trustees should be set aside, and in making these defendants, care should be taken to see that they are made personally defendants by name, and not, as parties have been made in these causes, by their mere partnership names. It is unnecessary to decide whether it is absolutely necessary that the Donnally Tract Petroleum Company should be made defendants in said cause. It is obvious that they can properly be made defendants, and therefore when new defendants are being made to said causes, as must be done, this company should also be made a defendant.

For these reasons the decree of the circuit court in this cause of November 27, 1874, dismissing the plaintiffs' bill and decreeing that the defendants recover of the plaintiffs their costs about their defence expended including $30.00 as allowed by law, must be reversed, set aside and annulled, and the appellants must recover of the appellees, F. F. Brooks and Isaac N. Smith, their costs in this Court expended; and this Court proceeding to render such a decree as the said circuit court should have rendered, must set aside, nullify and avoid, so much of the decree of October 31, 1872, in the causes of *Brooks* v. *Buchanan et al.* ; *Buchanan and West* v. *Brooks et al.*, and *Harris et al.* v. *Buchanan and West et*

*al.*, as approves and confirms the report of the commissioners of sale, Quarrier and Knight, and as confirms the sale made by them to F. F. Brooks, and as appointed E. B. Knight a special commissioner, and directed him as such to execute and acknowledge for record an apt and proper deed conveying to said F. F. Brooks the tract of land purchased by him at said sale, and so much of said decree as modified the decree of the October term, 1871, and allowed said deed to be then made to the purchaser, and also the deed made by said Knight as such special commissioner to said Brooks dated November 12, 1872, and also the deed from said Brooks to said Smith dated November 16, 1872, and also the two orders made in the cause of *Brooks* v. *Buchanan et al.*, of date November 8th and November 9th, awarding rules against certain persons to show cause why they should not deliver posession of said land to F. F. Brooks; that the plaintiffs recover of the defendants F. F. Brooks and Isaac N. Smith their costs expended in the circuit court of Kanawha county ; and that this opinion and decree be certified to the circuit court of Kanawha and filed in the papers of said two causes now pending in said court, with instructions that the court shall take such steps as are necessary to put the purchaser of said land, F. F. Brooks, and all other persons in the same position, that they were in before the confirmation of said report of said commissioners of sale and of said sale ; and take such other proceedings in said causes as are in accordance with the principles laid down in this opinion, and further according to the rules governing courts of equity.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.    CAUSE REMANDED.