Judge Carr
delivered his opinion.
It was objected by the counsel for the appellee, that the trustees were not the proper parties to file this bill, nor equity the proper forum. We must settle these points first.
By the deed of trust, it seems to have been intended to divest the grantor of all property, rights and credits* of *202 every kind. After a long and minute enumeration of the different articles of property, it adds, “ with all the other estate, both real and personal, of the said James Dickie This would convey, I presume, equitable as well as legal estate. The question raised by' the bill, is, whether the sale of the slave was not so conducted, that a Court of Chancery would pronounce it invalid, and the purchaser, a trustee for Dickie, holding the property subject to redemption, by payment of the amount of the executions. In this point of view, .it seems a question of property, which the trustees are the proper parties to litigate. Nor do I think the objection to the jurisdiction of the Court, well founded. Though it be true, as was contended, that the Sheriff might have been sued for the fraud, that does not seem to take from the party aggrieved, the power of waiving such suit, and coming into equity to redeem the slave. This is the every day jurisdiction of that forum. The books are full of, such cases; and it is much the most favourable course for the defendant, as it ensures to him, if the sale should be set aside, the payment of the executions, with their interest and costs, without further delay or litigation.
Upon the merits, the first question seems to be, was Harris interested in the execution? If he were, there need no authorities to tell us, that he was not the person to levy it; to sell and to buy under it. Sheriffs are confidential and highly responsible officers of the law. They are the trustees and agents, of both plaintiff and defendant; not selected by them, but imposed on them by the law; and therefore, for the honor of the law, and the purity of the administration of justice, it is vitally essential, that their conduct should be watched over with a vigilant and jealous eye. This is the more necessary, as their office clothes them with great power, and is constantly assailing them with strong temptations to abuse and pervert that power to sinister.and selfish purposes. To permit them to wield the process of oiir Courts, in their own cases; to cut and *203 carve for themselves; to exact such measure of justice, as self interest might dictate; would lead to oppression and abuse; would tend to subvert the foundation of private rights, and cover with deserved shame the ministers of justice. The defendant seems to have felt somewhat conscious of this; for, we see that the first execution, (while the debt was confessedly his own,) was levied by the High Sheriff; and before he would take the second into his own hands, he directed the clerk, to endorse it for the benefit of his father.
Was the debt really and bona fide, transferred to his father, by this endorsement? I confess, I rather think that it Was not. The whole case shews, that the execution was the property of Harris, up to the time of the endorsement. The bill charges this act to. have been a mere sham, to enable the defendant to take the levying and sale into his own hands. In reply, the defendant says, that the transfer was not a sham, but a real transaction; the purpose of which was, to secure to his father the proceeds of the execution, to re-pay money which his father had advanced, to enable him to farm the Shrievalty.
In the first place, this seems to me to be one of those substantive and affirmative allegations, which a defendant ought to prove by something more than his answer. If he'was the owner of the execution, it disqualified him to act. When this act is questioned, can he support it by the mere endorsement, and his own evidence that it was bona fide? We see no vestiges of a contract between him and his father, neither prior nor subsequent to the endorsement. We see no evidence that his father had advanced him money to farm the Shrievalty; and 1 think it was his place to have furnished us this evidence. He declared to Perrow, on the day of sale, that the execution under which he was about to sell, was his own; and that he must bring it to a close, for he wanted his money. lie dealt with the execution, in every respect, as owner, rather than as an officer, acting for another. When he bought the negro, *204 it was for himself, not his father; and yet we hear of no settlement with his father since. There is no such allegation in his answer.
But, even if it appeared that the transfer was a real one, to satisfy a debt bona fide due to his father, I should, as at present advised, still think that he could not deal with the execution as Sheriff. He was still too much interested to be that impartial and unbiassed agent, whom the law interposes for the protection of the rights of both plaintiff and defendant. He was still liable to his assignee for the debt> unless he made it by the execution. Nay, I am inclined to go even further; and though I do not mean positively to decide, I am free to state it as my impression, that a Sheriff, who is selling property under an execution, though he has no sort of interest in the debt, cannot legally buy of himself. I can find no decision of this point in our Reports; but all the analogies of the law are against it. It is well settled as a general principle, that trustees, agents, auctioneers, and all persons acting in a confidential character, are disqualified from purchasing. The characters of buyer and seller are incompatible, and cannot safely bo exercised by the same person. Emptor emit quam mi. nimo potest; venditor vendit quam máximo potest. The disqualification rests, as was strongly observed in the case of the York Buildings Company v. M’Kenzie, 8 Bro. Parl. Cas. 63, on no other than that principle which dictates that a person cannot be both judge and party. No man can serve two masters. He that is interested with the interests of others, cannot be allowed to mate the business an object of interest to himself; for, the frailty of our nature is such, that the power will too readily beget the inclination to serve our own interests at the expense of those who have trusted us. Lord Eldon says, in ex parte James, 8 Ves. 337: “ The doctrine as to purchases by trustees, assignees, and persons having a confidential character, stands much more upon general principles than upon the circumstances of individual case. It rests *205 on:-this; that the purchase is not .permitted, in any case, Iiowéver honest the circumstances; the general interests of justice requiring it to be destroyed in every instance, as no Court is equal to the examination and ascertainment of "the truth in much the greater number of cases.” To my mind, these principles seem to apply with great strength to the case of Sheriffs. They are appointed by the law, for the important purpose of carrying the'judgments of Courts into fair and impartial execution.. Clothed with the power of the Commonwealth, they levy their execution on what property they please. They fix the time and place of sale. They cry the property. There are a thousand ways in which they may discourage bidders, without committing themselves. They .can say to those who wish to buy, “ nothing but the money will dó.” They may even demand specie; while, if they bid themselves, there .is no need of having a cent of cash. They can bid.out the property to themselves, return the execution satisfied, and leave the plaintiff to get' his money by legal measures. These are my impressions on this important and interesting point.
But, thereareotherobjectionstothissale. It is laid down in many cases, that if the plaintiff in an execution raise doubts or make impressions, unfavorable to a fair sale, and then avail himself of these impressions, to buy in the property at an under rate, the sale will be set aside. In this case, it appears that there was a general impression among those present, that the Sheriff was to buy in the negro, and Dickie was to redeem. Garland says, "there were but three or four persons at the sale. Montgomery says, he thinks there were four besides himself; others say, there were several, speaking in general terms. Now Perrow says, Harris told him there was such an understanding. Garland says, that while at the place of sale, Montgomery told him, that he had no doubt there was an understanding between the parties; and Clarkson says, that he had heard, (though he does not exactly know from what quar *206 ter,) that such an arrangement had been made. This evidence shews, that whatever was the foundation, such an impression was general among those present; and so far as Perrow’s evidence will weigh, that impression came probably from Harris; for, he says that Harris told him so. This, though of itself, it might not form a decisive objection to the sale, certainly adds to the others.
But there is yet another objection. No person, I presume, would contend, that if the Sheriff were the only person at the sale, or the sole bidder, he might make a single bid, knock out the property, and support this as a valid sale. Such a proposition would contradict the whole tenor of the law, which has provided so anxiously for the publicity of the sale; would arm the Sheriff with a power truly tremendous; would subject the whole personal property of every debtor in the Commonwealth, to his grasp; and is, indeed, a position too monstrous to be debated. How was the fact in this sale ? The Sheriff and Perrow were the only bidders. Perrow did not bid, till called on by the Sheriff; and then merely (as he says in his deposition,) to make a sale, without the intention or the power to purchase; and this known to the’Sheriff. Was not the Sheriff, then, in truth, the only bidder? Unquestionably.
I am, therefore, clearly of opinion, that the decree should be reversed; the sale set aside; the cause sent back for an account, in which the Sheriff should be charged with the hires of the slave, and credited by the amount of the executions, interest, and costs at law;~that the trustees be decreed to pay the balance, if any, appearing due, in a given time, such as the Chancellor may direct; and if so paid, that the assignee be decreed to deliver the slave and her increase, if any, to the appellants; and in default of such payment, that there be a re-sale of the slave. And if it should appear from such account, that a balance of hire of the said slave is due from the Sheriff, the same, as well as the said slave and her increase, shall be decreed to the appellants.
*207 Judge Green.
Without determining or giving any opinion upon the question, whether a Sheriff can purchase property sold under execution by himself, I think it clear, that he cannot acquire an irredeemable title by such a purchase, unless it appear that his conduct has been jierfectly.fair, and with a view to procure the best price. Jn this cáse it appears that a pretty general impression prevailed among those who were present at the sale, (an impression which is traced, in part at least, to the Sheriff as its author,) that Dickie was to be permitted to redeem the slave, if purchased by the Sheriff; which was calculated to damp the biddings, and to sacrifice the property. Upon this ground, I concur in the decree proposed.
Judge Cabell concurred in the principles contained in Judge Carr’s opinion; and the decree was reversed, and ene entered up, in pursuance of the foregoing principles.*