# CHARLESTON

## YOUNGER v. MEADOWS *et al.*

Submitted September 11, 1907.    Decided December 17, 1907.

1. TAXATION—*Assessment—Verified Return—Conclusiveness.*

    Furnishing by the assessor to the owner of blanks on which to return a list of his property for taxation, and his reception from the owner of such return properly verified, as required by chapter 29 of the Code, such verified return being in aid of the assessor and not conclusive on him, are not a condition precedent to valid assessment. (p. 279.)

2. SAME—*Default in Payment—Levy and Sale.*

    A sheriff, in a levy and sale for taxes, is a ministerial officer, his action therein being subject to no supervision or order of a court, and, as in levy and sale under execution, is constituted in law the agent of the owner of the property without his consent: and the law imposes upon such officer the duty to act fairly in making such levy and sale. (p. 281.)

3. SAME—*Sale—Grossly Inadequate Price.*

    It is the duty of the sheriff in distraining for taxes to make no unreasonable distress or levy therefor, and to sell the property, where susceptible of division, in separate parcels, and not *en masse,* so as to cause the least sacrifice thereof possible; and a sale thereof otherwise at a grossly inadequate price is irregular and violative of his official duty. (p. 282.)

4. SAME—*Relief in Equity.*

    Gross inadequacy of price alone will not, as a general rule, avoid such a sale; yet, when combined with such irregularity in making the sale, or even slight circumstances indicating unfairness or fraud, it will furnish sufficient ground for equitable interposition. (p. 283.)

Appeal from Circuit Court, Raleigh County.

Bill by W. T. Younger against Isadore Meadows and others. Decree for plaintiff, and defendants appeal.

*Affirmed.*

McGinnis & Hatcher, for appellants.

M. G. McClung and Ashton File, for appellee.

Miller, President:

W. T. Younger and Crockett Mankin had been stockholders but not directors of the Raleigh Oil & Gas Company, a corporation. This company had acquired, among others, an oil and gas lease from Mankin of the farm on which he resided in Raleigh county, and in 1903 began drilling a well thereon, having assembled there all necessary tools and oil well supplies, including a large amount of iron casing. During progress of this work, in August, 1903, the company borrowed from Younger, who resided at Salam, Va., $1,500, and in November of that year $600, securing him in each case by deed of trust on all its said property, with John F. Davis, trustee. In December following the company also became indebted in the sum of $708 to Mankin, who shortly thereafter instituted a chancery suit to cancel as fraudulent the trust deeds of Younger and to charge the property therein conveyed with payment of his debt. On hearing of that cause, July 29, 1904, these deeds were adjudged valid liens, and the property decreed to be sold. August 27, 1904, the property was sold by the trustee, purchased by Younger at $2,368.80, and the sale later confirmed by the court—the net proceeds, $2,220.36, as directed by the decree, being paid over by the trustee to Younger and credited on his said debts. After his purchase, Younger allowed the property to remain at the well, and shortly afterward began negotiations with Mankin and others for sale of the property, or a reorganization of the company for further prosecution of work on the well so begun and nearly completed.

For 1905 the assessor of Raleigh county, without calling on Younger or receiving from him a verified return thereof, assessed this property to him for taxation at $8,000, the taxes for all purposes amounting to $136, and, with interest and costs to the time of the sale of the property therefor hereafter referred to, amounting to $141.88. Younger had no notice of such assessment or sale of his property. Negotiations between him and Mankin and others for sale thereof had continued and were pending down to the day of sale for taxes of the property, which took place, on Mankin's farm

where situated, on May 16, 1906, the same being sold by the sheriff *en masse* without effort to sell in parcels, the defendant Isadore Meadows becoming the purchaser for, as he claims, himself and the defendant Davis, at $145, but who immediately afterward, as he states without consulting Davis, admitted Mankin to partnership therein on equal terms, upon payment by the latter of one third of the purchase price; but the sheriff accepted in payment only $141.88, the amount of taxes and costs, in place of the amount bid for the property, although it is claimed by the defendants this was with the understanding that if the owner of the property, whom the sheriff professed he did not know where to find, should appear and claim the balance, the purchasers were to pay it.

A day or two after the sale by the sheriff, Mankin wrote Younger's attorney at Salem, Va., who had been conducting the negotiations with him for sale of the property—in reply to a letter from said attorney of May 3, 1906, received while notice of sale was posted on his premises but not answered until after the sale—saying "the matter is all off with you people, as Mr. Younger has nothing here. The entire outfit was sold for taxes and is now in the hands of other people. The rig was entirely destroyed by fire last winter, and one fire and a sheriff's sale puts any man out of business in this country." This letter brought Younger the first notice of the assessment and sale, and that part of his property had been destroyed by fire, confirmed by letter to his attorney of May 17th from Messrs. Laing & File, attorneys at Beckley, W. Va., with whom Younger's attorney at Salem had also been corresponding in reference to sale of the property, who represented therein that knowledge of the sale for taxes had just come to them from the purchasers, who had that day proposed to sell the property to them. Immediately after receiving this information Younger, through Messrs. Laing & File, tendered the defendants the amount of the taxes paid by them, which was refused; and this suit was brought to set aside and cancel the tax sale and recover the property sold, resulting in a decree April 11, 1907, in favor of the plaintiff, to reverse which the defendants have appealed to this Court.

That part of the decree which must be considered here is: "Upon consideration whereof the court is of opinion that the plaintiff has failed to sustain the allegations of fraud charged

in his bill, but that the assessment of the property sold was irregular, and that the property sold was in excess of what was required by law and irregular and illegal," entitling the plaintiff "to the relief prayed for in his said bill;" upon which finding it was "adjudged, ordered and decreed that the preliminary injunction heretofore awarded herein in vacation on the 24th day of May, 1906, be and the same is hereby continued and perpetuated * *; that the levy and sale of the property in the bill and proceedings in this cause mentioned by the sheriff * * to said Isadore Meadows and John F. Davis and * * by said Isadore Meadows and John F. Davis of one third interest in said property * * to Crockett Mankin, be and the same are * * hereby set aside, annulled and held for naught." The decree also provided for refunding to the defendants the taxes paid, and that the special receiver appointed should turn over the property to the plaintiff.

As the facts recited and decree indicate, the bill of the plaintiff bases his claim to relief against said tax sale and purchase upon the following grounds: alleged illegality of the assessment, for failure of the assessor to furnish him by mail or otherwise an assessment blank, or to call upon him for a verified return of his property thereon, as required by law; alleged excessive levy upon and sale *en masse* of said property in satisfaction of said taxes, at a grossly inadequate price; and alleged conspiracy and fraudulent conduct of the defendants at said sale, by which competition in bidding was prevented, said Meadows by words and conduct giving out the impression that he was bidding for the owner, and said Mankin at or before the sale falsely pretending to have a judgment against the property, by reason of which the purchasers procured the property at a grossly inadequate price.

The plaintiff has cross-assigned as error the finding of the court that he failed to sustain by proof his allegations of fraud; but it is claimed by defendants that such a finding of fact by the circuit court is usually conclusive, and we are cited to *Weaver* v. *Akin*, 48 W. Va. 456, and the numerous decisions of this Court there referred to, which do hold that such finding will not be disturbed, unless contrary to the plain preponderous of the evidence; and therefore, if the decree here cannot be supported upon other ground, we must

reverse it unless we find such preponderating evidence of fraud to overthrow the finding of the court below.

But we will first consider the alleged illegality of the assessment; for, if the assessment is illegal, the decree would stand on that ground alone. It is claimed that strict compliance with the several provisions of sections 13, 69, 70, 72, 73 and 74, chapter 29, Code, as amended in 1905, making it the duty of the assessor to furnish the tax payer blanks to list his property, the mailing thereof to him at his nearest post-office being by section 13 sufficient, and to previously procure from the tax payer such list verified as required by law—unless, after he has performed these duties, the tax payer neglects or refuses to make such verified return—is a condition precedent to a valid assessment of his property. Section 74 provides that "if any person fail to furnish a proper list, or if the list furnished be, in the judgment of the assessor, incomplete or erroneous in any respect, the assessor shall proceed to list the property and assess its value, or to supply the omission and correct the errors, upon the best information he can obtain, and for the purpose may call upon any officer of the state, county or district for such proper information as it may be in his power to give, and may require any person having possession, charge or controll of any personal property in the county to permit him to examine the same in order that a fair valuation thereof may be made." Section 13 also provides that "the failure of any tax payer to receive such blank shall in no case excuse him from making a list of his property when called on, or exempt him from taxation." The effect of sections 63 and 64 is to require the owners, whether resident or non-resident, to list for taxation their property located in this state.

These and other provisions of chapter 29 clearly indicate that the list to be returned by the tax payers are in aid of a proper assessment by the assessor, not for the protection of the tax payer, who is given his remedy against an improper assessment by application to the county court. True, section 73 imposes upon him a forfeiture and denies him all remedy for correction of any assessment by the assessor, if when called upon he refuses to furnish a proper list of his property or make the oath required thereto, or refuses to answer or answers untruly any question lawfully asked by the assessor;

and the same section says that "the return of the assessor showing that any person is the owner of any amount of property liable to taxation shall be *prima facie* evidence that such tax payer was called upon by the assessor to list his property." It can not be said that, under these provisions of law, the list of the tax payer is a prerequisite to a valid assesment.

In support of the argument that strict compliance with the statute by the assessor is necessary, to a valid assessment, we are cited to *Moss* v. *Shear*, 25 Cal. 38, and *Winnissimmet Co.* v. *Assessors*, 60 Mass. 477. The first case related to assessment of land, under a statute providing in what manner it should be assessed, whether in the name of the owner, to unknown owner or occupant, and prescribing the conditions applicable in each case; strict compliance by the assessor with the provisions of that statute was rightly held mandatory and prerequisite to a valid assessment as against each class of persons affected thereby. But that case is not applicable here. The provisions of the law there were for the protection of the tax payer, not merely to aid the assessor. In the latter case, the statute of Massachusetts provided that "the assessors may, in all cases, require any person bringing in such lists to make oath that the same is true;" and "the assessors shall receive, as the true valuation of the property of each individual, the list, if any, brought in by him, unless he shall, on being thereto required by the assessors, refuse to make oath that the same is true." Whether the alleged omission to give notice of the assessment would excuse the tax payer for not bringing in his list, and entitle him to the abatement of taxes provided for, was not decided, for reasons stated by the court. Nearly all the states have statutes similar to ours on the subject of assessment; and, by an almost unbroken line of decisions; it is held that the return required of the tax payer is not a condition precedent to a valid assessment, when the return is not made conclusive upon the assessing officer. 27 Am. & Eng. Enc. 670 and note 3, where the cases are collated. In *French* v. *Edwards*, 13 Wall. 506, it is held that statutory regulations intended for guidance of officers are directory unless accompanied by words importing that the acts shall not be done in any other manner or time, but that, when intended for protection of the citizen and disregard of

them would injure his property, they are mandatory. See note to the case, 7 Rose's Notes 744, where state and federal decisions affirming it are collated. We conclude, therefore, that our statutes impose no such condition precedent to a valid assessment, and that the assessment of the plaintiff's property was not void.

The validity of the assessment being established, counsel for appellants affirm that, fraud eliminated, all other grounds for relief are either not proven or do not constitute good cause for setting aside the sale. We can not accede to this view. While the court below, as we have concluded, wrongly founded its decree in part on the alleged illegality of the assessment, yet it was based also, as we think rightly, on the alleged irregularity and illegality of the levy, sale and purchase of the property.

With respect to the sheriff, he in a levy and sale, for taxes as well as under an execution, being a mere ministerial officer whose acts are not subject to confirmation, as in case of officers or commissioners acting under decree or order of the court having supervision over them, is constituted in law the agent of the parties, without their consent; and the law imposes upon him the duty to act fairly. *Slater* v. *Maxwell*, 6 Wall. 268; *McLeod* v. *Pearce*, 11 Am. Dec. 742; *Carter* v. *Harris*, 4 Rand. 202; *De Grauw* v. *Mechan*, 48 N. J. Eq. 219; *Underwood* v. *Mc Veigh*, 23 Grat. 409. Says Judge Carr in *Carter* v. *Harris*: "Sheriffs are confidential and highly responsible officers of the law. They are the trustees and agents, of both plaintiff and defendant; not selected by them, but imposed on them by the law; and therefore, for the honor of the law, and the purity of the administration of justice, it is vitally essential that their conduct should be watched over with a vigilant and jealous eye."

It is argued that there is no evidence of unreasonable distress; but the very tax ticket the sheriff held and on which he endorsed his levy showed that the property the taxes on which he was seeking to collect was assessed at a valuation of $8,000; and there is competent testimony that, at the time of the sale and after a part had been destroyed by fire, the property was worth in the neighborhood of $5,000. A number of the separate items of property, according to the evidence, each exceeded in value the total amount of the taxes;

the casing covered by the levy was alone estimated to be worth $2,700 at market price. These facts preclude the idea that the price at which this property was sold *en masse* justified a levy upon and sale of the whole for the mere pittance of the taxes. The sheriff made no effort to sell in parcels, as it was his duty under the law to do, for the protection of the owner. There may have been persons present, for all we know, who might have been willing to purchase a very small portion for sufficient to cover the taxes, but they were given no opportunity to do so. The fact that the property was sold *en masse* is relied on to avoid the sale; but it is claimed no proof was offered to show that it was not necessary to so sell in order to obtain the taxes. A sufficient answer to this is the one already made—that it was the duty of the officer to sell in parcels; and it was not incumbent upon the plaintiff to show that it was not necessary to so sell *en masse*.

In making sale of real estate, Code, chapter 31, section 8, provides that "the sale shall be of each tract  *  *  or of such separate quantities or parts of such tract  *  *  as shall be sufficient to satisfy the whole of the taxes." This law would inhibit the sheriff from selling separate tracts *en masse*. Code, sections 19 and 20, chapter 41, provide that "the officer shall in no case make an unreasonable distress or levy," and that, with reference to sale, "the officer shall sell to the highest bidder for cash  *  *  the said goods and chattels, or so much thereof as may be necessary." These sections imply, indeed they in effect command, that goods and chattels so distrained shall be separately sold. But, independently of statute, general law would exact fairness in the conduct of an officer in such cases. Mechem on Pub. Offices & Officers sections 755, 773; *Handy* v. *Clippert*, 50 Mich. 355; Murfree on Sheriffs, section 527. In *Handy* v. *Clippert*, Judge Cooley says: "It can not be tolerated that such a seizure shall go unrebuked. The officer is or should be a minister of justice, not of oppression; and he should execute every writ put into his hands in such a manner as to do as little mischief to the debtor as possible."

The sheriff did not call upon the owner for payment of his taxes, excusing himself on the ground of "want of knowledge of where he lived. Mankin, on whose farm the property was, knew, for he had recently been in correspondence

with plaintiff. The natural thing for the sheriff to have done was to make inquiry of Mankin at the time of his levy. Besides, Younger had only recently been engaged in litigation with Mankin, in the court of which the sheriff was an officer, in which litigation Younger had become purchaser of the property.

In *Stead* v. *Course*, 8 Cranch. 412, Chief Justice Marshall says, in reference to a sale for taxes, that "its validity depends on the authority of the collector to sell, and on the fairness of the transaction. * * He must act in conformity with the law from which his power is derived, and the purchaser is bound to inquire if he has so acted." In *Smith* v. *Huntoon*, 134 Ill. 24, it is held that "an execution sale *en masse*, when the property is susceptible of division and a smaller portion would if offered have satisfied the debt, is irregular, and the sale will be set aside in equity;" and, following *Phelps* v. *Conover*, 25 Ill. 312, the court further says "the debtor also has the right to demand that the sale shall be conducted according to law, and in such a manner as shall not needlessly sacrifice his property." In a note to *Patterson* v. *Carneal*, 13 Am. Dec. 212, it is said: "In the case of an execution sale, the sheriff has a plain ministerial duty to perform by selling the debtor's property for the debt, interest and costs; and if he exceeds the authority given him by the *fi. fa.*, it is a usurpation of power, for the time being, at least, that the debtor is powerless to control. The action of the sheriff does not require the approval or confirmation of the court, and therefore the wisdom of the rule declaring such unauthorized acts on the part of officers, or even ministerial agents, null and void." In *Lurton* v. *Rodgers*, 32 Am. St. 214, it is affirmed, under a statute practically the same as ours, that, "when property susceptible of division is sold under execution *en masse* for an inadequate price without first being offered in separate parcels, the sale will be set aside." In that case, the sale *en masse* was of two lots valued at $2,000 for $60, without having first been offered separately. The sale was set aside; and the principle applied there is applicable as well in sales of personal property as real estate.

It is true that gross inadequacy of price alone will not, as a general rule, avoid a sale, particularly a judicial sale; yet, when

combined with irregularity in making the sale, or even slight circumstances indicating unfairness or fraud, it will furnish sufficient ground for equitable interposition. *Smith* v. *Huntoon* and *Underwood* v. *McVeigh, supra.* The sacrifice of the plaintiff's property here was we think the inevitable result of the violation of the duty of the officer in making the sale in the manner complained of. He should have advertised, and sold, the property by separate items.

With respect to the conduct of the purchasers, we need not necessarily convict them of positive fraud; but their conduct at the sale, taken in connection with the excessive levy and the manner and conduct of the sale by the officer, constituted such unfairness therein, and worked such prejudice to the rights of the owner of the property, as warranted the court in setting aside the sale. In *Underwood* v. *McVeigh, supra,* it is held that, where the fairness of the transaction and the good faith of the purchaser are impeached, the conduct of the officer and inadequacy of price are entitled to great weight. The purchasers here had notice of the manner of the levy upon and offer of the property by the sheriff, and of the irregularity therein. The defendant Meadows was the county clerk of Raleigh County, and accompanied the sheriff to the place of sale. It is claimed he represented to the sheriff and other persons present that he was bidding in the property for the owner. The evidence does not clearly show that he made such representation in exact terms, nor what his exact expressions were. His own words on the witness stand were as follows: "Q. Did or did you not on the day of the sale make the statement to any party present at the sale that it was no use anybody bidding, that you had come to bid the taxes, or words to that effect? A. I did not make that statement that I remember of, certain. Q. Or words to that effect? A. No, sir; except what I intimated to Crock. Q. That was the idea you intended to convey, was it not? A. Well, I didn't care what he took it for. Q. From the conduct of Crock Mankin at the sale you were led to believe, Mr. Meadows, that Crock believed you had come there for the purpose of representing W. T. Younger, the owner of the property? A. I suppose he did from the fact that he quit bidding when I bid the taxes." This and other testimony of Meadows convince us that he purposely gave

out the impression that he was bidding in the property for the owner, that he knew Mankin at least had that impression; but he allowed the sale to proceed, for the purpose (as he says) of buying the property as cheaply as he could.

Moreover, after the property was knocked down to him and the price exceeded by a few dollars the exact amount of the taxes, he represented to the sheriff that he had only intended to bid the amount of the taxes; and the sheriff accepted from him in payment just the amount of the taxes, and did not require him to pay the amount he bid. This is explained, it is true, by the representation of the sheriff that he did not know who was entitled to the surplus, and that he arranged with the purchasers to pay the balance if later called for. Mankin, who became one of the beneficiaries of this purchase, knew who was entitled to the surplus; he was then in correspondence with Younger. The sheriff could then have ascertained to whom the surplus belonged by inquiry of him.

We can not say positively from the evidence that Mankin had any prior arrangement with Meadows for the purchase. The circumstance of his becoming interested immediately after the sale on equal terms, as explained by Meadows, is that he wanted to avoid trouble with Mankin, that Mankin represented he had judgment agaist the property or that Younger owed him quite a sum of money, and that no matter who the purchaser might be he would not be allowed to take the property off of his farm until he got his money. But Meadows seems to have known of this claim before the sale. Mankin quit bidding, for some reason, when Meadows bid the amount of the taxes. Meadows must have known the sale of the property for taxes would free it from any claim of Mankin, by judgment or otherwise. There were several persons present at the sale, but Meadows and Mankin did most if not all of the bidding. These facts, though not convincing, arouse suspicion of some prior arrangement between Meadows and Mankin.

The result of the whole matter was that the plaintiff's property was sold and sacrificed, without his knowledge and contrary to the forms of law, and the defendants became beneficiaries thereof. Under the circumstances proven, all notion of fair dealing is precluded, and the authorities above cited fully justify the decree of the circuit court; we are therefore of opinion to affirm it.

*Affirmed.*